No. 53,592

IN THE MATTER OF THE ADOPTION OF BABY BOY L.

(643 P.2d 168)

Opinion filed April 3, 1982.

*Pamela S. Fahey,* of Native American Law Project, Legal Services of Northeast Kansas, of Horton, and *Bertram E. Hirsch,* of Floral Park, New York, argued the cause, and *Susan Ellis,* of Legal Aid Society of Wichita, Inc., of Wichita, and *Ross A. Hollander,* of Wichita, were with them on the brief for appellants.

*Randall H. Elam,* of Wichita, argued the cause, and *Vincent L. Bogart,* of Vincent L. Bogart, Chartered, of Wichita, argued the cause and was on the brief for appellees.

*Jan Goslin,* of Mayetta, was on the brief *in propria persona* for the *amicus curiae,* Four Tribes Children's Program.

The opinion of the court was delivered by

HOLMES, J.: This is an appeal from sundry trial court rulings and findings and from a decree of adoption entered by the Sedgwick County District Court. Carmon Perciado (Perciado), the putative father of Baby Boy L., an infant born out of wedlock, Quelin and Ernestine Perciado, the baby's paternal grandparents, and the Kiowa Tribe of Oklahoma, are the appellants. The adoptive parents are the appellees. The baby is the illegitimate son of Miss L., a non-Indian and the appellant, Carmon Perciado, a five-eighths by blood relationship Kiowa Indian duly enrolled as a member of the Kiowa Tribe. The appellants contend that the trial court erred in determining that the provisions of the Indian Child Welfare Act of 1978 (ICWA or the Act), 25 U.S.C. § 1901 *et seq.* (Supp. III 1979), were not applicable to the adoption proceeding and in the alternative assert that if the Act does not apply then the adoption is invalid under state law.

Due to the involved procedural aspects of this case, it is necessary that we set forth the facts in some detail. Baby Boy L. was born at Wichita, January 29, 1981. On the same date his natural mother, an unmarried non-Indian woman, executed a consent to the adoption specifically directed and limited to the adoptive parents named in the consent. The appellees filed their petition for adoption along with the mother's consent the same day and the court entered an order granting them the temporary

care and custody of the child. It is not disputed that the appellant Perciado is the father of the child. Notice of the adoption proceedings and time of hearing was personally served on Perciado at the Kansas State Industrial Reformatory where he was incarcerated and upon the State Department of Social and Rehabilitation Services (SRS).

On March 6, 1981, Perciado filed an affidavit of indigency and the court appointed representatives of the Legal Aid Society of Wichita, Inc., to represent him. On March 9, 1981, appellees filed an amendment to their adoption petition alleging Perciado was "an unfit person to have or assume or be given parental responsibilities" and asked that his parental rights be terminated and severed. On March 11, 1981, SRS filed its report recommending the granting of the adoption. On March 25, 1981, Perciado filed an answer to the amended petition asking that the adoption be denied, that he be found a fit and proper person, that his parental rights not be severed and that he be given permanent custody of his son.

On March 30, 1981, the matter was called for trial and the court ruled that it would bifurcate the proceedings and proceed first with the determination of the fitness of the father and whether his parental rights should be severed, and second, with the adoption itself. No objection to this procedure was made by Perciado, who was present in person (having been transported from the Kansas State Industrial Reformatory), or by his counsel, and evidence was introduced on behalf of appellees and by Perciado. Eight witnesses testified on behalf of the appellees and Perciado presented one witness, at which time the trial was recessed until April 1, 1981. On April 1, 1981, it was brought to the court's attention that Perciado was an enrolled member of the Kiowa Tribe and that the federal Indian Child Welfare Act of 1978 might apply, and therefore the case was continued for thirty days to allow proper notice to be given to the Kiowa Tribe. Thereafter, notice was given to the Kiowa Business Committee at Anadarko, Oklahoma. On April 14, 1981, an amended or supplemental consent to the adoption was filed by the baby's mother. This consent was also limited strictly to the named appellees. On May 7, 1981, Perciado, through the Legal Aid Society, filed an amended answer in which he alleged that the ICWA applied to the proceedings and asked, among other things, that the child be

placed with a member of its extended family, or other members of the Kiowa Tribe, or with other Indian families as defined by the Act. On May 8, 1981, the Kiowa Tribe filed a petition to intervene in the proceedings and on May 29, 1981, a notice of appearance was filed by Bertram E. Hirsch, an attorney from New York, on behalf of the Kiowa Tribe and the paternal grandparents. Mr. Hirsch associated with local counsel in Wichita as required by our rules. On May 16, 1981, the Business Committee of the Kiowa Indian Tribe, over the objections of the baby's mother, enrolled Baby Boy L. as a member of the Tribe with a Kiowa blood degree of 5/16ths. On June 15, 1981, Perciado and the Kiowa Tribe filed a petition to change temporary custody and a petition to transfer jurisdiction of the case to the Court of Indian Offenses at Anadarko, Oklahoma. Appellees filed answers to the various petitions filed by the appellants and the matter again came before the court on June 24, 1981. The applicability of the Indian Child Welfare Act had been submitted by all parties on briefs filed with the court and the court found that the Act did not apply to the proceedings and therefore denied the petition of the Kiowa Tribe to intervene and then held that the petition for temporary custody and the petition to transfer jurisdiction to the Court of Indian Offenses were moot.

The court then proceeded to hear additional evidence from Perciado on the question of his fitness and whether his consent to the adoption was required. Mr. Hirsch was denied the right to participate in the proceedings on behalf of his clients, as their petition to intervene had been denied, but was allowed to sit with, counsel and advise the attorneys for the father. After the completion of the evidence, the court determined that Perciado was an unfit person to have the care, custody or control of the minor child. Having determined that the father, Perciado, was an unfit person to have the care or custody of Baby Boy L., the court then proceeded to hear evidence on the advisability of the adoption itself, the second portion of the bifurcated proceedings. After hearing this additional evidence, the court found that the appellees were suitable persons to adopt the child, that it was in the best interests of the child to grant the adoption, and the adoption of Baby Boy L. by the appellees was granted.

Appellants have appealed, raising numerous issues. The first three points asserted by the appellants will be considered to-

gether as they all involve the applicability of the ICWA. Those points are:

1. The ICWA is applicable to adoption proceedings under state law where the child to be adopted is a member of an Indian tribe and is illegitimate, and the acknowledged putative father is a member of an Indian tribe.

2. The Kiowa Tribe of Oklahoma has a right to intervene in this proceeding.

3. The appellants have a right to petition the trial court to transfer jurisdiction and to change temporary custody in these proceedings.

At the outset, we are faced with the interpretation of complex federal legislation which is not only confusing but, if applied as requested by the appellants, would also be inconsistent, contradictory, and would accomplish no worthwhile or useful purpose. As stated by one author:

"Enacted in 1978, the Indian Child Welfare Act (Act) is the result of an attempt by Congress to promote the stability of Indian families and tribes. *Responding to a demonstrated risk of unwarranted removal of Indian children from their homes by state and private child welfare agencies, the Act was intended to impose strict procedural limitations on these agencies' activities.* Unfortunately, the Act falls far short of achieving the goals set by Congress. [Emphasis added.]

. . . .

"Although these provisions [of the Act] are well intentioned, their effectiveness is limited by inconsistencies and ambiguities in the drafting of the Act. Consequently, the Act may confuse and even exacerbate the problems which prompted its passage." Barsh, *The Indian Child Welfare Act of 1978: A Critical Analysis*, 31 Hastings L.J. 1287-88.

In overruling the Kiowa Tribe's motion to intervene on the grounds that the ICWA did not apply to these proceedings, the trial court made, *inter alia,* the following findings and conclusions:

"3. That the application to intervene was not filed within twenty (20) days as required by the Indian Child Welfare Act, 25 USC 1911, nor was the application verified as required by K.S.A. 59-2202.

"4. That the Indian Child Welfare Act of 1978, 25 USC Section 1901, et seq. has no application to the factual situation before the Court in that:

(a) The adoption Petition concerns the illegitimate child of a non-Indian mother.

(b) The child involved herein was born on January 29, 1981, and on the same day, [Miss L.], the natural mother of said child, voluntarily consented and released said child into the care of the Petitioners, who are non-Indian.

(c) That the attorney for the Petitioners herein notified the Kiowa Indian Tribe of Oklahoma of the proceedings herein by notice which was received by the Kiowa Indian Tribe on the 14th day of April, 1981.

(d) The child has never been in the care or custody of the putative father who is five-eighths Kiowa Indian.

(e) The issue of the preservation of the Indian family is not involved as the child has never been a part of any Indian family relationship.

(f) The subject matter of this litigation, Baby Boy L., is not a member of an Indian family.

(g) The child appears to have been enrolled as a member of the Kiowa Tribe of Oklahoma subsequent to the initiation of these proceedings and contrary to the expressed wishes of the natural mother, a non-Indian.

(h) The controversy does not involve a situation where a State or Federal agency is attempting to unilaterally remove an Indian child from his home and thereby break up an Indian family.

(i) Absent the consent of the natural mother to the adoption, it appears that the child would not have been in an Indian home, nor part of an Indian family.

"5. The minor child's home has at all times been exclusively with [appellees], non-Indians, and this is the total extent of his family relationship to date.

"6. The Act is concerned with establishing proper definitions and safeguards in the situation where Indian children are being removed from their families by reason of child neglect, abuse, or similar grounds. These issues are not present in an adoption proceeding instituted on the voluntary consent of a non-Indian unwed mother of an illegitimate child, where that child's care and custody has, with the natural mother's permission, been with non-Indian proposed adoptive parents since the child's birth."

The Indian Child Welfare Act, 25 U.S.C. § 1901 *et seq.*, was enacted by Congress in 1978, and in § 1902 the policy behind the adoption of the Act was expressed as:

"The Congress hereby declares that it is the policy of this Nation to protect the best interests of Indian children and to *promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families* and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture, and by providing for assistance to Indian tribes in the operation of child and family service programs." (Emphasis added.)

A careful study of the legislative history behind the Act and the Act itself discloses that the overriding concern of Congress and the proponents of the Act was the maintenance of the family and tribal relationships existing in Indian homes and to set minimum

standards for the removal of Indian children from their existing Indian environment. It was not to dictate that an illegitimate infant who has never been a member of an Indian home or culture, and probably never would be, should be removed from its primary cultural heritage and placed in an Indian environment over the express objections of its non-Indian mother. Section 1902 of the Act makes it clear that it is the declared policy of Congress that the Act is to adopt minimum federal standards "for the removal of Indian children from their [Indian] families." Numerous provisions of the Act support our conclusion that it was never the intent of Congress that the Act would apply to a factual situation such as is before the court.

Included in the congressional findings to support the Act is § 1901(4) to the effect "that an alarmingly high percentage of Indian families are broken up by the removal, often unwarranted, of their children from them . . . ." Section 1911(a) provides exclusive jurisdiction in the Indian tribe "over any child custody proceeding involving an Indian child who resides or is domiciled within the reservation . . . ." Section 1912(d) provides that efforts should be made to prevent the breakup of the Indian family while subsections (e) and (f) refer to "the continued custody of the child by the parent or Indian custodian" and the potential for emotional or physical damage to the child. Section 1914 again refers to the removal of the child from the parent or Indian custodian. Sections 1916(b), 1920 and 1922 also reflect the underlying thread that runs throughout the entire Act to the effect that the Act is concerned with the removal of Indian children from an existing Indian family unit and the resultant breakup of the Indian family. In this case Baby Boy L. is only 5/16th Kiowa Indian, has never been removed from an Indian family and so long as the mother is alive to object, would probably never become a part of the Perciado or any other Indian family. While it is true that this Act could have been more clearly and precisely drawn, we are of the opinion that to apply the Act to a factual situation such as the one before us would be to violate the policy and intent of Congress rather than uphold them. Professor Barsh states in his article cited earlier:

"Under the Act, a child custody proceeding may be either a foster care placement, a preadoptive placement, an adoption, or a termination of parental rights. In all four categories, the common element is the parents' loss of control over the child. Involuntary investigations and home interventions by social welfare agencies implicitly are excluded.

"Expressly excluded from the definition of child custody proceeding are placements based on acts of a child that are essentially criminal in nature, such as the institutionalization of a minor for theft or joyriding. Also expressly excluded are custody awards in divorce proceedings. Thus, the Indian Child Welfare Act does not disturb the power of states to intervene in Indian homes as a preventive measure, to remove or institutionalize Indian children on grounds of juvenile delinquency, or to determine the custody of Indian children when their parents seek a divorce. *The Act principally applies to cases where a state court attempts to remove an Indian child from his or her home on grounds of the alleged incompetence or brutality of the parents.*" p. 1305.

We conclude the trial court was correct in its determination that the ICWA, by its own terms, does not apply to these proceedings and therefore its rulings on the various petitions filed by appellants were correct.

Appellants, of course, along with some legal writers, do not agree with our interpretation of the Act. However, for the sake of argument, if we were to hold that the ICWA applied to these proceedings, then we still fail to see where any reversible error could exist. It has been stated that only two prerequisites exist for the application of the Act: (1) a "child custody proceeding" (2) involving an "Indian child," as those terms are defined in the Act. Wamser, *Child Welfare Under the Indian Child Welfare Act of 1978: A New Mexico Focus,* 10 N.M.L. Rev. 413, 419-22 (1980).

Section 1903, the definitional section of the Act, provides in part:

"[T]he term—(1) 'child custody proceeding' shall mean and include

. . . .

(ii) 'termination of parental rights' which shall mean any action resulting in the termination of the parent-child relationship;

. . . .

(iv) 'adoptive placement' which shall mean the permanent placement of an Indian child for adoption, including any action resulting in a final decree of adoption.

. . . .

"(4) 'Indian child' means any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe."

It is undisputed that Baby Boy L. is the biological child of Perciado, who is ⅝ths Kiowa Indian and a member of the Kiowa Tribe. It is also undisputed that the Kiowa Tribe requires that for a person to be eligible for enrollment in the tribe, such person must be at least one-fourth Kiowa Indian by degree of blood

relationship. Baby Boy L. is five-sixteenths Kiowa Indian by degree of blood relationship and therefore meets the tribal requirements. Thus, as defined by the Act, Baby Boy L. must be considered an "Indian child" within the definitions of the Act. Appellees make much of the fact that the child's mother objected to his enrollment in the tribe but we find nothing in the record or in the Act that precludes the enrollment of an otherwise qualified child into an Indian tribe because of the opposition of one of its parents.

Continuing with the assumption that the Act does apply to these proceedings we will briefly address appellants' second and third points. Appellants contend it was error to refuse to allow the Kiowa Tribe to intervene. If the Act were applicable we would agree. Section 1911(c) provides:

"In any State court proceeding for the foster care placement of, or termination of parental rights to, an Indian child, the Indian custodian of the child and the Indian child's tribe shall have a right to intervene at any point in the proceeding."

Thus, it is obvious that if the Act were applicable the trial court was in error in refusing to allow intervention by the Kiowa Tribe. However, even if such were the case, the error would have been harmless at best.

The mother of Baby Boy L. gave a consent to the appellees to adopt her child. The consent was limited to the two named appellees and was for their benefit only. She has made it clear that if this adoption was denied for any reason, or if an attempt was made to place the child for adoption under the terms of the Act, she would revoke her consent and again take custody of her child, and never consent to his placement with his father or with the father's extended Indian family, the Kiowa Tribe, the grandparents or anyone else. Section 1913(c) of the Act provides:

"In any voluntary proceeding for termination of parental rights to, or adoptive placement of, an Indian child, *the consent of the parent may be withdrawn for any reason at any time prior to the entry of a final decree of termination or adoption,* as the case may be, *and the child shall be returned to the parent."* (Emphasis added.)

In *Treiber v. Stong,* 5 Kan. App. 2d 392, 617 P.2d 114, *rev. denied* 228 Kan. 807 (1980), the Court of Appeals held:

"The irrevocability of a consent under K.S.A. 59-2102 applies to disputes between a natural parent or parents and the prospective adoptive parents and the consent, when withdrawn, is not binding on the consenting parent in a custody dispute between the natural parents." Syl. ¶ 3.

Under either the Act or Kansas law, any proceedings which the Kiowa Tribe might have undertaken if allowed to intervene would have been useless. Any attempt to effect the preferential placement contemplated by the Act would necessarily result in the removal of the baby from the custody of appellees and thereupon there being no consent by the mother to any such action, the child would be returned to her. We do not believe that the Congress intended such ridiculous results nor do we believe that the Kiowa Tribe could in good faith recommend such a procedure. Any error which might have occurred by refusal of the Kiowa Tribe's petition to intervene would be harmless. It is elementary that the law, including the ICWA, and the courts do not require citizens and litigants to perform useless acts and be subjected to useless court proceedings when there is no possibility of any positive result for anyone.

In 73 Am. Jur. 2d, Statutes, we find:

§ 249. Generally. In the construction of statutes, the courts start with the assumption that the legislature intended to enact an effective law, and the legislature is not to be presumed to have done a vain thing in the enactment of a statute. Hence, it is a general principle that the courts should, if reasonably possible to do so interpret the statute, or the provision being construed, so as to give it efficient operation and effect as a whole." p. 422.

"§ 251. Although the courts can only interpret a statute as framed, notwithstanding difficulties in its application, a construction of an ambiguous statute should be avoided which would render the application of the statute impracticable, or inconvenient, or which would require the performance of a vain, idle, or futile thing, or attempt to require the performance of an impossible act." p. 424.

"§ 265. A statute subject to interpretation is presumed not to have been intended to produce absurd consequences, but to have the most reasonable operation that its language permits. If possible, doubtful provisions should be given a reasonable, rational, sensible, and intelligent construction. These rules prevail where they are not restrained by the clear language of the statute. Under this rule, general terms in a statute should be so limited in their application as not to lead to absurd consequences." p. 434.

Next the appellants assert error in the failure of the court to consider their petition to transfer jurisdiction to the Court of Indian Offenses at Anadarko, Oklahoma. Section 1911(b) of the Act provides:

"In any State court proceeding for the foster care placement of, or termination of parental rights to, an Indian child not domiciled or residing within the reservation of the Indian child's tribe, the court, in the absence of good cause to the contrary, shall transfer such proceeding to the jurisdiction of the tribe, *absent objection by either parent,* upon the petition of either parent or the Indian

custodian or the Indian child's tribe: *Provided,* That such transfer shall be subject to declination by the tribal court of such tribe." (Emphasis added.)

In the instant case, it is clear that the mother of Baby Boy L. objected to the transfer of the adoption proceeding to the Court of Indian Offenses and as specifically provided by the statute such a transfer could not be made over her objection. In addition, there would certainly appear to be good cause not to transfer such proceedings. All of the parties involved, the child, the adoptive parents, the biological parents and necessary witnesses were located in Sedgwick County and there was no showing that any of the parties had any contact or connection with the Indian court at Anadarko, Oklahoma. Assuming the mother had not objected to a transfer of jurisdiction, the court would still have been justified in refusing transfer on the basis of "good cause to the contrary."

Finally it is asserted the appellants had the right to petition for a change of temporary custody. Assuming the Act applied, they would have the right to file such a petition. However, under the Act, the granting of such a petition is discretionary with the court and a denial under the facts in this case would not constitute an abuse of discretion.

Therefore, we conclude, first, that the ICWA by its own terms and intent was not applicable to this action and, second, assuming arguendo the Act did apply, the trial court did not commit reversible error in denying the petition of the Kiowa Tribe to intervene or in finding the petition to change jurisdiction and petition for change of temporary custody were moot. Appellants' first three points on appeal lack merit.

For those interested in further authorities on the ICWA, see Note, *The Indian Child Welfare Act of 1978: Provisions and Policy,* 25 S.D. L. Rev. 98 (1980); Note, *Indian Child Welfare: A Jurisdictional Approach,* 21 Ariz. L. Rev. 1123 (1979); Guerrero, *Indian Child Welfare Act of 1978: A Response to the Threat to Indian Culture Caused by Foster and Adoptive Placements of Indian Children,* 7 Amer. Indian L. Rev. 51 (1979); Note, *In re D.L.L. & C.L.L., Minors: Ruling on the Constitutionality of the Indian Child Welfare Act,* 26 S.D. L. Rev. 67 (1981).

We will now turn to appellants' attack upon the adoption proceedings and the decree granted by the trial court. Appellants contend that there was insufficient evidence to show that Perciado was unfit to assume parental duties and in the alternative

that the question of his fitness is not an issue in this case. For reasons which will hereafter become clear, we are of the opinion that the fitness of Perciado was a relevant issue in these proceedings.

The trial court, in ruling that Perciado was unfit and that his consent to the adoption was not required, made the following statement:

"THE COURT: All right. Having examined the file, heard the evidence over a period of several months and through several hearings, I make the following findings of fact and conclusions of law:

"I find that the subject matter of this adoption, baby boy L, is the child of an unmarried, non-Indian woman, that was born on January 29th, 1981, at Wichita, Kansas. That the natural mother   .   .   .   executed her consent to the adoption of this child by the Petitioners   .   .   .   .   That the natural mother informed, at least, the Petitioners' attorney that the father of the child was one Carmon E. Perciado, who was, at the time the petition was filed in January of 1981, was incarcerated at the Kansas State Penitentiary — Industrial Reformatory, I guess K.S.I.R., in Hutchinson, Kansas. That notice was served upon the natural father whom I shall refer to herein as Respondent or hereafter. That the Respondent filed his pleading in which he acknowledged paternity, objected to the adoption by the Petitioners and requested the Court to appoint an attorney for him, and that he be present for the hearings on the petition. The Court, in response to his pleading, appointed Legal Aid Society of Wichita, Inc., to represent the Respondent which organization, through Ms. Susan Ellis, has represented the Respondent throughout these proceedings. That the Respondent has been present in court each time the matter has been before the Court.

"That the matter proceeded to trial on March 30th, 1981. The Court took judicial notice of certain of its own court files: 79 CR 1298, 79 CR 619, 80 CR 1672, all of which are felony convictions, the last of which the Respondent was serving time at the reformatory at Hutchinson as a result of a plea of guilty.

"The Court heard further testimony as to the Respondent's attitude and conduct and with respect to his position in society. I find that the Defendant, on numerous occasions, prior to his incarceration at Hutchinson, was either drinking alcoholic beverages or was drunk, was taking drugs, was engaged in fighting, picking fights with people, other persons. That the Respondent either pled guilty or was tried and found guilty in Municipal Court of numerous offenses consisting of battery of police officers, resisting arrest, battery, inciting a riot and spent, it would appear to be, several months incarcerated, certainly, as a result of these convictions.

"I find that probably the Respondent has had contact with small children, specifically his nieces and nephews and another child of the natural mother of baby boy L. He has had no experience in taking care of children in providing for their needs, hasn't been concerned with children, to speak of.

"I find that the Respondent has admitted to numerous crimes, including armed robbery, that [he] apparently has never been charged with. I find that while he was on probation to this Court that he violated the conditions of his probation. I find that the Respondent not only uses drugs, but uses toluol; that he has spent some several months at Larned Hospital, the reason for which is not clear. But I

think the Court can take judicial notice that Larned State Hospital is a hospital for the mentally ill or the criminally insane. The Court is of the opinion that, at least prior to his incarceration, if he didn't have a complete disregard for the law, he had, at least, a substantial disregard for the law and the rights of other people, and for that reason would not be a fit and proper person to have the care, custody and control of his child. I don't think under the law that he's entitled to a chance to demonstrate his fitness. He's had his chance. He didn't take advantage of it. The law that's applied is that as a putative father or a father of an illegitimate child he's entitled to notice of the hearing and a right to be heard as to the fitness. He's not entitled to any trial period, so to speak, to demonstrate that he now can or will in the future be able to take care of the child. I think that the Court has to go on what his conduct was in the past. The evidence is that he has been recommended to meet the parole board, but there is no indication that he's going to be granted a parole. It appears to me that the Respondent's main interest in seeking to obtain the custody of the child is for the benefit of his mother and father which, I think, is a noble gesture, but I am not able to come to the conclusion that it's because he wants the child because he's the father of the child.

"The Court concludes that the Respondent is unfit within the meanings of *In Re Vallimont, Finney v. Finney* and the other case law applicable to these type of situations in Kansas.

"The Court, therefore, concludes that the consent of the natural father is not necessary to confer jurisdiction on the Court for the adoption."

The court thereafter made "a further finding that the Respondent called the natural mother during the time that she was pregnant and advised her that he had the money for her to have an abortion."

Later, at the conclusion of the evidence on the adoption, the court found that the petitioners were suitable persons to be granted the adoption of Baby Boy L. and that it was in the best interests of the child that the adoption be granted.

In addition to the findings of the court, which were all based upon substantial evidence, there was evidence that Perciado was violent toward members of his own family, that he beat and abused the child's mother, before and during the time she was pregnant, and that he broke into her house and stole personal property from her. The evidence in this case is overwhelming that Perciado is unfit to assume parental duties based upon any known community standards or degree of proof. See *Finney v. Finney,* 201 Kan. 263, 440 P.2d 608 (1968), and *In re Vallimont,* 182 Kan. 334, 321 P.2d 190 (1958). Appellant argues that no one knows whether he would be a fit parent because he has never had the opportunity to have the child. We know of no law anywhere that would require this court or any other court to submit a helpless infant to an environment and standard of conduct displayed by

this father. To do so could very well endanger the physical well-being and perhaps even the life of this child. We find no error in the trial court's finding that Perciado is unfit to assume his parental duties, even if he were in a position to do so.

Finally, appellants contend that the adoption must be set aside because there was no showing that the father had failed to support the child for two years [K.S.A. 59-2102(3)] and that our statute which requires only the consent of the mother of an illegitimate child [K.S.A. 59-2102(2)] is unconstitutional as a violation of the equal protection clause of the Fourteenth Amendment as interpreted in *Caban v. Mohammed,* 441 U.S. 380, 60 L.Ed.2d 297, 99 S.Ct. 1760 (1979). While this argument was not presented to the trial court and ordinarily would not be considered for the first time on appeal, we deem the issue raised under *Caban* of such significance that we will address the issue. It is appellant's argument that the consent of both parents to an adoption is necessary unless it falls under K.S.A. 59-2102(3), (4) or (5).

K.S.A. 59-2102 provides in part:

"Before any minor child is adopted, consent must be given to such adoption:
(1) by the living parents of a legitimate child or
(2) by the mother of an illegitimate child or
(3) by one of the parents if the other has failed or refused to assume the duties of a parent for two (2) consecutive years or is incapable of giving such consent or
. . . ."

The United States Supreme Court has recognized in a trilogy of cases the constitutional rights of the father of an illegitimate child when the father-child relationship may be affected. In *Stanley v. Illinois,* 405 U.S. 645, 31 L.Ed.2d 551, 92 S.Ct. 1208 (1972), the court reviewed proceedings from the State of Illinois in which the State, upon the death of the mother of certain illegitimate children, instituted proceedings to declare the children wards of the State and to place them with court-appointed guardians. The proceedings were conducted pursuant to Illinois statutes under which an unwed father is subject to being deprived of the custody of his illegitimate children in dependency proceedings without any hearing as to his fitness as a parent whereas married or divorced parents or unwed mothers raising their children can be deprived of custody only through proceedings in which the parent is entitled to a hearing on fitness. The court held that the Illinois procedure violated the due process and equal protection

rights of Stanley, who had lived with and supported the children's mother and the children for years.

"The State of Illinois assumes custody of the children of married parents, divorced parents, and unmarried mothers only after a hearing and proof of neglect. The children of unmarried fathers, however, are declared dependent children without a hearing on parental fitness and without proof of neglect. Stanley's claim in the state courts and here is that failure to afford him a hearing on his parental qualifications while extending it to other parents denied him equal protection of the laws. We have concluded that all Illinois parents are constitutionally entitled to a hearing on their fitness before their children are removed from their custody. It follows that denying such a hearing to Stanley and those like him while granting it to other Illinois parents is inescapably contrary to the Equal Protection Clause." *Stanley v. Illinois*, 405 U.S. at 658.

Certainly the safeguards prescribed in *Stanley* were met in the instant case. Perciado was furnished counsel and personally participated in the hotly contested hearings in which testimony was received from at least thirteen witnesses.

In *Quilloin v. Walcott*, 434 U.S. 246, 54 L.Ed.2d 511, 98 S.Ct. 549 (1978), the court was faced with a controversy from the State of Georgia between a stepfather and the biological father of an illegitimate eleven-year-old child. The stepfather, who had been married to the child's mother for approximately nine years, desired to adopt the child and under Georgia law, the consent of the father of an illegitimate child was not required. Mr. Justice Marshall, writing for a unanimous court, stated the issue and facts as:

"The issue in this case is the constitutionality of Georgia's adoption laws as applied to deny an unwed father authority to prevent adoption of his illegitimate child. The child was born in December 1964 and has been in the custody and control of his mother, appellee Ardell Williams Walcott, for his entire life. The mother and the child's natural father, appellant Leon Webster Quilloin, never married each other or established a home together, and in September 1967 the mother married appellee Randall Walcott. In March 1976, she consented to adoption of the child by her husband, who immediately filed a petition for adoption. Appellant attempted to block the adoption and to secure visitation rights, but he did not seek custody or object to the child's continuing to live with appellees. Although appellant was not found to be an unfit parent, the adoption was granted over his objection.

"In *Stanley v. Illinois*, 405 U.S. 645 (1972), this Court held that the State of Illinois was barred, as a matter of both due process and equal protection, from taking custody of the children of an unwed father, absent a hearing and a particularized finding that the father was an unfit parent. The Court concluded, on the one hand, that a father's interest in the 'companionship, care, custody, and management' of his children is 'cognizable and substantial,' *id.*, at 651-652, and,

on the other hand, that the State's interest in caring for the children is '*de minimis*' if the father is in fact a fit parent, *id.,* at 657-658. *Stanley* left unresolved the degree of protection a State must afford to the rights of an unwed father in a situation, such as that presented here, in which the countervailing interests are more substantial.

"Generally speaking, under Georgia law a child born in wedlock cannot be adopted without the consent of each living parent who has not voluntarily surrendered rights in the child or been adjudicated an unfit parent. Even where the child's parents are divorced or separated at the time of the adoption proceedings, either parent may veto the adoption. In contrast, only the consent of the mother is required for adoption of an illegitimate child." pp. 247-248.

Thus it may be seen that the essential part of the Georgia statute was similar to K.S.A. 59-2102(2). Quilloin, the biological father, attempted to block the proposed adoption of his illegitimate child by seeking to have the child legitimized under existing Georgia statutes, by seeking visitation rights and by objecting to the adoption. After a full evidentiary hearing on all of Quilloin's contentions, the court found that it was in the best interests of the child to grant the adoption, and that to grant the father's request for legitimation and visitation rights would not be in the best interests of the child, and both requests were denied. The trial court was affirmed by the Georgia Supreme Court and an appeal was taken to the U.S. Supreme Court where Quilloin alleged his due process and equal protection rights were violated. The due process argument was based upon a failure of the trial court to find him unfit and the equal protection argument was based upon the disparate treatment between fathers of illegitimate children and those of legitimate children. The court found that under the facts of the case, the "best interests of the child" standard was sufficient to satisfy the due process attack.

Insofar as the equal protection argument was concerned, the court stated:

"We think appellant's interests are readily distinguishable from those of a separated or divorced father, and accordingly believe that the State could permissibly give appellant less veto authority than it provides to a married father." p. 256.

The court found that the difference in the extent of the commitment to the welfare of the child that obviously exists between fathers of illegitimate children and those of children born in wedlock was sufficient to satisfy the State's interest in the welfare of its children in setting different veto authority to an adoption,

and that such a different standard or requirement did not violate Quilloin's equal protection rights.

Finally, only a year later, *Caban v. Mohammed*, 441 U.S. 380, was decided by the court. Under a New York statute similar to ours, the court held that the statute which granted an unwed mother the authority to block the adoption of her child simply by withholding consent but did not give an unwed father a similar right was unconstitutional as a violation of the gender-based prohibition against denial of equal protection of the laws. Caban and Maria Mohammed had lived together out-of-wedlock for several years in New York City during which time two children were born. Caban was the acknowledged father and contributed to their support over the years. After he and Maria separated, and she married Mohammed, Caban continued to maintain contact with the children and throughout the years maintained a close personal and familial relationship with them. Maria's new husband desired to adopt the two Caban children. Section 111 of the New York Domestic Relations Law (McKinney 1977) provided in part:

"Subject to the limitations hereinafter set forth, consent to adoption shall be required as follows:

1. Of the adoptive child, if over fourteen years of age, unless the judge or surrogate in his discretion dispenses with such consent;

2. Of the parents or surviving parent, whether adult or infant, of a child born in wedlock;

3. Of the mother, whether adult or infant, of a child born out of wedlock;

4. . . . . ."

Certain exceptions and limitations were contained within the statute which are not relevant to our decision here.

As is obvious, the New York statute as it applies to the father of an illegitimate child is essentially identical to our own statute now before this court for examination. A sharply divided court (5 to 4), held in *Caban* that the New York statute, when applied under the specific facts of the case as an absolute bar to the rights of the father to object to the adoption of his illegitimate child, was unconstitutional as a gender-based violation of the equal protection clause. The New York court in approving the adoption had relied exclusively on Section 111(3) of their statute and not upon possible statutory exceptions. A careful reading of *Caban* reveals that it is directed to the specific factual situation before the court. Caban had demonstrated that he was a capable and loving father; he had established and maintained a close family relationship

with Maria and the children for several years and continued to maintain contact with and an interest in the children after he and Maria had separated and even after her marriage to Mohammed. The court specifically pointed out that in *Quilloin* the court had recognized the importance of the actual factual relationship that exists. The court also indicated that its ruling might be different in a situation where an infant is involved as opposed to older children. In addition, the court stated that in cases where the father never has come forward to participate in the rearing of his child, "nothing in the Equal Protection Clause precludes the State from withholding from him [the biological father] the privilege of vetoing the adoption of that child." p. 392. It also recognized that a different result might be reached if the father was found unfit after a notice and hearing as required in *Stanley*. Thus it is clear that the *Caban* decision was a narrow one based upon its particular facts and that not all factual situations give the father of an illegitimate child veto power over adoption.

Mr. Justice Stewart, in his dissenting opinion, stated:

"The Constitution does not require that an unmarried father's substantive parental rights must always be coextensive with those afforded to the fathers of legitimate children. In this setting, it is plain that the absence of a legal tie with the mother provides a constitutionally valid ground for distinction. The decision to withhold from the unwed father the power to veto an adoption by the natural mother and her husband may well reflect a judgment that the putative father should not be able arbitrarily to withhold the benefit of legitimacy from his children.

"Even if it be assumed that each married parent after divorce has some substantive due process right to maintain his or her parental relationship, cf. *Smith v. Organization of Foster Families,* 431 U.S. 816, 862-863 (opinion concurring in judgment), it by no means follows that each unwed parent has any such right. Parental rights do not spring full-blown from the biological connection between parent and child. They require relationships more enduring. The mother carries and bears the child, and in this sense her parental relationship is clear. The validity of the father's parental claims must be gauged by other measures. By tradition, the primary measure has been the legitimate familial relationship he creates with the child by marriage with the mother. By definition, the question before us can arise only when no such marriage has taken place. In some circumstances the actual relationship between father and child may suffice to create in the unwed father parental interests comparable to those of the married father. Cf. *Stanley v. Illinois, supra.* But here we are concerned with the rights the unwed father may have when his wishes and those of the mother are in conflict, and the child's best interests are served by a resolution in favor of the mother. It seems to me that the absence of a legal tie with the mother may in such circumstances appropriately place a limit on whatever substantive constitutional

claims might otherwise exist by virtue of the father's actual relationship with the children.

"The appellant's equal protection challenge to the distinction drawn between the unwed father and mother seems to me more substantial. Gender, like race, is a highly visible and immutable characteristic that has historically been the touchstone for pervasive but often subtle discrimination. Although the analogy to race is not perfect and the constitutional inquiry therefore somewhat different, gender-based statutory classifications deserve careful constitutional examination because they may reflect or operate to perpetuate mythical or stereotyped assumptions about the proper roles and the relative capabilities of men and women that are unrelated to any inherent differences between the sexes. Cf. *Orr v. Orr*, 440 U.S. 268. Sex-based classifications are in many settings invidious because they relegate a person to the place set aside for the group on the basis of an attribute that the person cannot change. *Reed v. Reed*, 404 U.S. 71; *Stanton v. Stanton*, 421 U.S. 7; *Frontiero v. Richardson*, 411 U.S. 677; *Weinberger v. Wiesenfeld*, 420 U.S. 636; *Orr v. Orr, supra.* Such laws cannot be defended, as can the bulk of the classifications that fill the statute books, simply on the ground that the generalizations they reflect may be true of the majority of members of the class, for a gender-based classification need not ring false to work a discrimination that in the individual case might be invidious. Nonetheless, gender-based classifications are not invariably invalid. When men and women are not in fact similarly situated in the area covered by the legislation in question, the Equal Protection Clause is not violated. See, *e.g., Schlesinger v. Ballard*, 419 U.S. 498. Cf. *San Antonio Independent School Dist. v. Rodriguez*, 411 U.S. 1, 59 (concurring opinion).

"In my view, the gender-based distinction drawn by New York falls in this latter category. With respect to a large group of adoptions — those of newborn children and infants — unwed mothers and unwed fathers are simply not similarly situated, as my Brother Stevens has demonstrated. Our law has given the unwed mother the custody of her illegitimate children precisely because it is she who bears the child and because the vast majority of unwed fathers have been unknown, unavailable, or simply uninterested. See H. Clark, Law of Domestic Relations 176-177 (1968); H. Krause, Illegitimacy; Law and Social Policy 29-32 (1971). This custodial preference has carried with it a correlative power in the mother to place her child for adoption or not to do so.

"The majority of the States have incorporated these basic common-law rules in their statutes identifying the persons whose participation or consent is requisite to a valid adoption. See generally Note, 59 Va. L. Rev. 517 (1973); Comment, 70 Mich. L. Rev. 1581 (1972). These common-law and statutory rules of law reflect the physical reality that only the mother carries and gives birth to the child, as well as the undeniable social reality that the unwed mother is always an identifiable parent and the custodian of the child — until or unless the State intervenes. The biological father, unless he has established a familial tie with the child by marrying the mother, is often a total stranger from the State's point of view. I do not understand the Court to question these pragmatic differences. See *ante,* at 392. An unwed father who has not come forward and who has established no relationship with the child is plainly not in a situation similar to the mother's. New York's consent distinctions have clearly been made on this basis, and in my view they do not violate the Equal Protection Clause of the Fourteenth Amendment.

See *Schlesinger v. Ballard, supra.*

"In this case, of course, we are concerned not with an unwilling or unidentified father but instead with an unwed father who has established a paternal relationship with his children. He is thus similarly situated to the mother, and his claim is that he thus has parental interests no less deserving of protection than those of the mother. His contention that the New York law in question consequently discriminates against him on the basis of gender cannot be lightly dismissed. For substantially the reasons expressed by Mr. Justice Stevens in his dissenting opinion, *post*, at 412-413, I believe, however, that this gender-based distinction does not violate the Equal Protection Clause as applied in the circumstances of the present case.

"It must be remembered that here there are not two, but three interests at stake: the mother's, the father's, and the children's. Concerns humane as well as practical abundantly support New York's provision that only one parent need consent to the adoption of an illegitimate child, though it requires both parents to consent to the adoption of one already legitimate. If the consent of both unwed parents were required, and one withheld that consent, the illegitimate child would remain illegitimate. Viewed in these terms the statute does not in any sense discriminate on the basis of sex. The question, then, is whether the decision to select the unwed mother as the parent entitled to give or withhold consent and to apply that rule even when the unwed father in fact has a paternal relationship with his children constitutes invidious sex-based discrimination." pp. 397-400.

Mr. Justice Stevens in his dissenting opinion addressed the constitutional issues and found no violation in the New York statute and also set forth his ideas on the limited application of the majority opinion as follows:

"There is often the risk that the arguments one advances in dissent may give rise to a broader reading of the Court's opinion than is appropriate. That risk is especially grave when the Court is embarking on a new course that threatens to interfere with social arrangements that have come into use over long periods of time. Because I consider the course on which the Court is currently embarked to be potentially most serious, I shall explain why I regard its holding in this case as quite narrow.

"The adoption decrees that have been entered without the consent of the natural father must number in the millions. An untold number of family and financial decisions have been made in reliance on the validity of those decrees. Because the Court has crossed a new constitutional frontier with today's decision, those reliance interests unquestionably foreclose retroactive application of this ruling. See *Chevron Oil Co. v. Huson,* 404 U.S. 97, 106-107. Families that include adopted children need have no concern about the probable impact of this case on their familial security.

"Nor is there any reason why the decision should affect the processing of most future adoptions. The fact that an unusual application of a state statute has been held unconstitutional on equal protection grounds does not necessarily eliminate the entire statute as a basis for future legitimate state action. The procedure to be followed in cases involving infants who are in the custody of their mothers— whether solely or jointly with the father—or of agencies with authority to consent

to adoption, is entirely unaffected by the Court's holding or by its reasoning. In fact, as I read the Court's opinion, the statutes now in effect may be enforced as usual unless 'the adoption of an older child is sought,' *ante*, at 392, and the 'father has established a substantial relationship with the child and [is willing to admit] his paternity.' *Ante*, at 393. State legislatures will no doubt promptly revise their adoption laws to comply with the rule of this case, but as long as state courts are prepared to construe their existing statutes to contain a requirement of paternal consent 'in cases such as this,' *ibid.*, I see no reason why they may not continue to enter valid adoption decrees in the countless routine cases that will arise before the statutes can be amended.

"In short, this is an exceptional case that should have no effect on the typical adoption proceeding. Indeed, I suspect that it will affect only a tiny fraction of the cases covered by the statutes that must now be rewritten. Accordingly, although my disagreement with the Court is as profound as that fraction is small, I am confident that the wisdom of judges will forestall any widespread harm." pp. 415-417.

We agree and concur with the views expressed by Mr. Justice Stewart and Mr. Justice Stevens.

With the foregoing factual situation and legal principles illucidated in *Stanley, Quilloin* and *Caban* before us, we now turn to the validity of K.S.A. 59-2102(2) as applied to the factual situation of Perciado.

Kansas has not ignored the rights of an unwed father in adoption proceedings. See Note, *Constitutional Law - Rights of an Unwed Father in an Adoption Proceeding,* 27 Kan. L. Rev. 483 (1979). In *In re Lathrop*, 2 Kan. App. 2d 90, 575 P.2d 894 (1978), the court was faced with two issues: (1) whether the natural father of an illegitimate child has a paramount right over non-parents to custody of the child; and (2) whether K.S.A. 59-2102(2), which requires the consent of the unwed mother but not the unwed father is unconstitutional. The Court of Appeals affirmed a trial court ruling that the natural father of an illegitimate child has a paramount right to custody as against non-parents where both the adopting parents and the father are found to be fit. The Court of Appeals also held that the statute did not violate either the due process or equal protection clauses of the Constitution. The mother of the infant child consented two days after birth to the baby's adoption by the appellees and they were given immediate care and custody. At the adoption hearing the natural father objected and, after a hearing in which the father and the adoptive parents were all found to be fit, the court denied the adoption. After giving careful consideration to *Stanley v. Illinois* and *Quil-*

*loin v. Walcott,* along with the parental preference doctrine as recognized in Kansas, the court held:

"The rights to conceive and raise one's children are 'essential rights' protected by the due process and equal protection clauses of the Fourteenth Amendment even though the family relationship is unlegitimized by marriage." Syl. ¶ 1.

"In an appeal by prospective adoptive parents from a district court order denying their petition to adopt a baby girl, held: the father of the illegitimate child who appeared and sought custody of the child *and who had not been found unfit* was properly granted custody as against the prospective adoptive parents." Syl. ¶ 2. (Emphasis added.)

"The father of an illegitimate child is an 'interested party' within the meaning of K.S.A. 59-2278 and must be given notice of the pending adoption of his child." Syl. ¶ 3.

"If after being given notice of the pending adoption the father appears and asserts his desire to assume parental responsibilities toward the child, his rights in the child must be given preference over those of third-party adoptive parents unless he has failed to assume parental responsibilities for the statutory period of two years *or he is found to be unfit.* However, if he chooses not to appear and make known his desire to care for the child, his rights are *de minimis* and may be terminated without his consent by finalizing the adoption." Syl. ¶ 4. (Emphasis added.)

The court went on to hold that K.S.A. 59-2102(2) did not offend the due process and equal protection guarantees of the constitution.

In *Aslin v. Seamon,* 225 Kan. 77, 587 P.2d 875 (1978), the Supreme Court was faced with a determination of whether the father of an illegitimate child could give consent to an adoption when the child had been abandoned by its unwed mother. In *Aslin* this court stated:

"We emphasize in the instant case that we are asked only to determine whether the father of an illegitimate child can give his consent to adoption under K.S.A. 59-2102(3). Here a simple reading of the Kansas statutory provision indicates paragraph three does not differentiate between legitimate and illegitimate children. The unadjudicated natural father, William Thompson, notoriously recognized his paternity not only by taking his children in; acknowledging them as his own; giving them parental support; and finding them a home with his sister and her husband, but also by recognizing them in writing when he consented to the adoption petition. The trial court found for purposes of the adoption William Thompson was the natural father of the children and could give his consent. It should not be prerequisite, in a situation such as we have in this case, that the father first be adjudicated the natural father in separate proceedings. When the question arises whether or not the mother has abandoned her illegitimate children, and the father has notoriously and in writing acknowledged his paternity before the court, he should be allowed to consent to their adoption. Such a holding places no limitation on the due process notice requirements to the parent who is alleged to have abandoned the child." pp. 81-82.

Appellants argue, however, that the fitness of Perciado is not an issue in this case and that *Caban* should be applied to strike down all adoptions where the trial court relies upon K.S.A. 59-2102(2) in dispensing with the necessity for the consent of the father of an illegitimate child. We think appellants construe *Caban* too broadly.

Appellants rely principally upon *In re Adoption of Wilson,* 227 Kan. 803, 610 P.2d 598 (1980), and *Treiber v. Stong,* 5 Kan. App. 2d 392, 617 P.2d 114, *rev. denied* 228 Kan. 807 (1980), to support their contentions. In *Treiber* the court was faced with a custody battle between the unwed parents. Although an adoption had been involved, the adopting parents evidently grew discouraged over the litigation, dismissed the adoption proceedings and relinquished custody to the mother. The court in its opinion stated:

"[I]f the parental rights of a natural father of an illegitimate child have not been severed and those rights have been asserted by him, he has preference to custody of the child over prospective adoptive parents unless he has failed or refused to assume his parental duties for two consecutive years. *In re Lathrop,* 2 Kan. App. 2d 90, 575 P.2d 894 (1978); K.S.A. 59-2102(3)." p. 395.

Appellants contend that as the Court of Appeals failed to include the unfitness of the father in the foregoing statement, they were modifying *Lathrop.* It should be noted that the statement and Syl. ¶ 1 are pure dicta in that the issue of consent to adoption became moot when the adoption proceedings were dismissed and any discussion on the point relied upon by the appellants is not controlling. See *Flax v. Kansas Turnpike Authority,* 226 Kan. 1, Syl. ¶¶ 1, 2, 596 P.2d 446 (1979).

In *Wilson* the dispute was between the natural father of two children and the adoptive parents, and principally involved a finding that the father had failed to assume the duties of a parent for two (2) consecutive years under K.S.A. 59-2102(3). The children were born in wedlock and no question as to the application of K.S.A. 59-2102(2) was before the court. While the trial court stated "the fitness of a parent is not an issue in determining whether such parent's consent to a proposed adoption is required by K.S.A. 59-2102," the statements of the court must be read in light of the facts of the case. The question of whether fitness is an issue under K.S.A. 59-2102(2) when an illegitimate child is involved, was not before the court.

In examining the constitutionality of any statute there are certain basic principles which must be adhered to:

"We start with the proposition that the constitutionality of a statute is presumed; that all doubts must be resolved in favor of its validity, and before the statute may be stricken, it must clearly appear the statute violates the Constitution. It is the court's duty to uphold the statute under attack, if possible, rather than defeat it. If there is any reasonable way a statute may be construed constitutionally permissible, that should be done." *Board of Greenwood County Comm'rs v. Nadel*, 228 Kan. 469, Syl. ¶ 1, 618 P.2d 778 (1980).

"A statute, apparently valid upon its face, may be unconstitutional in its application to a particular set of facts, circumstances or classifications." *Flax v. Kansas Turnpike Authority*, 226 Kan. 1, Syl. ¶ 6, 596 P.2d 446 (1979).

The corollary of *Flax*, of course, is that a statute apparently void on its face may be constitutional when limited and construed in such a way as to uphold its constitutionality by reading the necessary judicial requirements into the statute. This has often been done when it is clear that such an interpretation will carry out the intent of the legislature. *State v. Motion Picture Entitled "The Bet"*, 219 Kan. 64, 70, 547 P.2d 760 (1976); *State v. Gunzelman*, 210 Kan. 481, 502 P.2d 705 (1972); *State v. Hart*, 200 Kan. 153, 434 P.2d 999 (1967).

With the foregoing principles in mind it is obvious that K.S.A. 59-2102(2) is not unconstitutional in all adoption cases involving an unwed father. The extremes involving application of the statute would be (1) where the father is unknown or the child is the result of rape, it is obvious that consent would not be required; and (2) in a case such as *Caban* where the children were several years old, the father had established a close-knit familial relationship with the children and their mother and had supported and nurtured them for years, consent would be necessary. Is there a middle ground in which K.S.A. 59-2102(2) is constitutional based upon the facts of the case? We think so. In *Caban* the Supreme Court indicated that the adoption of an illegitimate infant or one whose father had failed to come forth and provide support would probably not require consent so long as the safeguards of *Stanley* and *Quilloin* were observed. The court has often recognized that the State has a definite interest in the welfare of its children and a detailed discussion of the State's role as *parens patraie* would unduly extend this already too lengthy opinion.

Appellants contend that the appellees should have first prevailed upon the mother to bring relinquishment proceedings

under K.S.A. 38-113a. Such proceedings are not a part of the adoption statutes and while they have no application to the facts before us, the statute is indicative of the legislative intent involving illegitimate children and reveals certain factual situations which are pertinent to our discussion. The statute provides that the mother of an illegitimate child may relinquish her child for adoption pursuant to K.S.A. 38-112a without the consent of the father when:

"(1) The father abandoned or neglected the child after having knowledge of the child's birth;

(2) the father is unfit as a parent;

(3) the father has made no reasonable efforts to support or communicate with the child after having knowledge of the child's birth;

(4) the father failed without reasonable cause to provide support for the mother during the six months prior to the child's birth;

(5) the father abandoned the mother after having knowledge of the pregnancy; or

(6) the birth of the illegitimate child was the result of rape of the mother."

While we do not consider such factual situations to be exclusive, we believe they are descriptive of situations where, applying the requirements of *Caban,* the adoption of an illegitimate child without the father's consent pursuant to K.S.A. 59-2102(2) would not be unconstitutional.

We hold that under the facts of this case the consent of Mr. Perciado to the adoption of his illegitimate child is not required and the application of K.S.A. 59-2102(2) is constitutional and does not violate either the due process or equal protection guarantees of the Fourteenth Amendment.

The judgment is affirmed.