(103 P.3d 976)
Nos. 91,519
91,520

IN THE MATTER OF S.M.H., A MINOR CHILD,
AND IN THE MATTER OF L.M.H., A MINOR CHILD.

Opinion filed January 14, 2005. ▮

*Charles C. Baylor*, of St. Mary's, for appellant.

*Sherri Schuck*, assistant county attorney, *Ian H. Taylor*, of Knopp & Bannister, P.A., of Manhattan, *Vivian Olsen*, of St. Mary's, and *Phill Kline*, attorney general, for appellees.

Before HILL, P.J., MARQUARDT and JOHNSON, JJ.

HILL, J.: V.H., mother of two Cherokee Indian children, claims that the Indian Child Welfare Act (ICWA) was not followed in her case and appeals the district court's judgment that her children were children in need of care as defined by the Kansas Code for the Care of Children. Because the ICWA standards were not followed in her case, we reverse the finding.

*Background*

V.H., mother of L.M.H., age 15, and S.M.H., age 12, contacted the Pottawatomie County Sheriff's Department around midnight on June 13, 2003, to report that L.M.H. had run away from home. The father of L.M.H. and S.M.H. is deceased. Deputy Pfrang spoke with V.H. and R.N., V.H.'s live-in boyfriend. Pfrang thought that V.H. was intoxicated because her speech was slurred, and he had been to V.H. and R.N.'s residence on prior occasions in response to domestic situations when both were intoxicated.

Pfrang and another deputy arrived at V.H.'s residence early on June 14. V.H. was holding a beer can, could barely keep her eyes open, and had difficulty maintaining her balance when she met the officers at the door. According to Pfrang, V.H.'s residence "reeked of alcohol." Because V.H. had difficulty communicating, another daughter, S.M.H., attempted to interpret her mother's speech. The officers were told that R.N. was in a rear bedroom and did not want to be involved.

V.H. indicated that L.M.H. had left home, with her permission, approximately 1 week earlier. V.H. said she contacted the police because L.M.H. had not returned home that evening as V.H. had required. V.H. was unable to tell the officers where L.M.H. was

or how to contact L.M.H., except to indicate that V.H.'s oldest daughter, B.H., who resided nearby, would know how to contact L.M.H. Deputy Pfrang accompanied V.H. to B.H.'s house. B.H. told Pfrang she had provided her mother with the contact information but that V.H. was too drunk to recall where L.M.H. was staying.

With the information provided by B.H., Pfrang contacted L.M.H. L.M.H. said she did not want to return home because V.H. and R.N. consumed alcohol to excess and often argued. Pfrang concluded that it would be best for L.M.H. to remain in her present location for the night.

Pfrang returned to V.H.'s residence to inform her of his decision. Upon hearing that L.M.H. would not be returning home, the remaining daughter, S.M.H., became very upset. Pfrang approached S.M.H. to speak with her. S.M.H. told Pfrang that she did not feel safe when V.H. and R.N. became intoxicated and argued. She wanted L.M.H. to return to the house to protect her.

Pfrang decided that V.H.'s home did not provide a safe environment for S.M.H. and that L.M.H. should not return to that situation. While Pfrang was telling V.H. of his decision, R.N. came out of the rear bedroom. R.N. appeared intoxicated and was extremely angry. He and V.H. began yelling at Pfrang and S.M.H. V.H. told Pfrang that he could "take all of the children out of her house, because she couldn't control them." The officers placed both children in protective custody.

*Trial History*

On June 16, 2003, the State filed separate petitions alleging that both S.M.H. and L.M.H. were children in need of care (CINC) according to K.S.A. Supp. 38-1502d(2). Attached to the petitions was Deputy Pfrang's report, which indicated that the Pottawatomie County Sheriff's Department had responded to V.H.'s residence 10 times in 4 months regarding domestic disturbances, thefts, one fight, one missing person, and one "speak with officer."

Attorneys were appointed as guardians ad litem (GAL) for the children. A temporary custody hearing was held the next day. At that hearing, V.H. admitted that she and R.N. had alcohol-related

problems and expressed concern over her ability to control her children. The family had unsuccessfully completed family preservation on two prior occasions. The magistrate found that even though reasonable efforts had been made to maintain the family, it would be contrary to the children's welfare for them to remain in V.H.'s home. The court placed the children in the temporary custody of SRS.

Because V.H. indicated the children were registered with the Pottawatomie Nation Indian Tribe, the State sent a notice to the Prairie Band Pottawatomie Nation on June 20, 2003, indicating that an adjudication hearing was set for July 18, 2003. That notice was evidently forwarded to the Cherokee Nation, because on August 20, 2003, the Cherokee Nation filed a Notice of Intervention, indicating that L.M.H. and S.M.H. were Cherokee Indian children.

At the adjudication hearing, the magistrate found that clear and convincing evidence supported a determination that V.H. was unable to provide adequate care and control necessary for the physical, mental, or emotional health of both children on June 13-14, 2003. The court found that both children were CINC and should remain in the custody of SRS and continue in an out-of-home placement. A disposition hearing was set for November 13, 2003.

V.H. appealed this finding to the district judge. After listening to arguments from the parties, including both GALs, and reviewing the transcript of the proceedings held before the magistrate, the judge found that clear and convincing evidence supported the magistrate's ruling and concluded that both S.M.H. and L.M.H. were CINC. The case was remanded to the magistrate for disposition.

V.H. now appeals the district court's decision to us. Despite the fact that both children have been returned to her custody and the supervision of the SRS has discontinued, we have retained this appeal for two reasons. First, this case is not moot because SRS seeks reimbursement for foster care. Second, K.S.A. 38-1585(a)(3) creates a presumptive finding of parental unfitness when a child in parental custody has been adjudicated a CINC on two or more prior occasions. Therefore, any future action concerning the find-

ing that these were children in need of care could have a dramatic effect on V.H and her ability to defend against a claim of unfitness.

*Two Different Laws*

This case is on the interface between the Kansas Code for the Care of Children, K.S.A. 38-1501 *et seq.*, and the Indian Child Welfare Act, 25 U.S.C. § 1901 *et seq.*

For children in Kansas who are in need of care, an action is commenced by filing a petition requesting the court to find the children to be CINC. The matter then proceeds according to a prescribed course of proceedings set out in K.S.A. 38-1532 *et seq.* However, K.S.A. 2003 Supp. 38-1503(a) makes it clear that CINC proceedings are not governed by the Code for the Care of Children "in those instances when the Indian child welfare act of 1978 applies."

In order for the ICWA to apply, a court must determine that the proceedings are "child custody proceedings" involving an "Indian child," as both terms are defined in the ICWA. See *In re Adoption of Baby Boy L.*, 231 Kan. 199, 207 643 P.2d 168 (1982). An "Indian child" is an unmarried person under the age of 18 who is either a tribe member or eligible for tribe membership and is the biological child of a tribe member. 25 U.S.C. §1903(4). On August 20, 2003, the Cherokee Nation filed a Notice of Intervention indicating that L.M.H. and S.M.H. were Indian children. A tribe's determination of membership or membership eligibility is conclusive and final. See *Adoption of Riffle*, 273 Mont. 237, 242, 902 P.2d 542 (1995), *appeal after remand* 277 Mont. 388, 922 P.2d 510 (1996).

The Cherokee Nation notified the court it wanted to be involved in case activity, reserving the "right to intervene at any point in a state court proceeding for the foster care placement of, termination of parental rights of, or adoption of an Indian child so that it may exercise all rights conferred upon it by 25 U.S.C. Sec. 1901, et seq." It also reserved the right to transfer the proceedings and to request an additional 20 days to prepare for a proceeding.

The ICWA establishes both jurisdictional and substantive procedures for custody determination of Indian children. *In re A.P.*,

25 Kan. App. 2d 268, 274, 961 P.2d 706 (1998). Tribal court juris-diction exists for custody cases involving children residing on the reservation and wards of the tribe. 25 U.S.C. § 1911(a). In the absence of good cause, cases involving children not domiciled on the reservation should be transferred to the tribal court. 25 U.S.C. § 1911(b). The tribe can intervene at any time in the proceedings to insure that the interests of the tribe are protected. 25 U.S.C. § 1911(c). Relevantly, a "child custody proceeding" includes foster care placement where an Indian child is removed from his or her parent for temporary placement in a foster home and the parent "cannot have the child returned upon demand, but where parental rights have not been terminated." 25 U.S.C. § 1903(1)(i).

It is undisputed that the ICWA applied to these proceedings concerning L.M.H. and S.M.H. Nonetheless, neither the magistrate nor the district judge made specific findings that S.M.H. and L.M.H. were Indian children and that the ICWA was applicable to the proceedings as they were required by law to do. In any proceeding involving custody of a child of Indian heritage, the court must make a determination of whether the ICWA governs the proceeding. See *In re H.A.M.,* 25 Kan. App. 2d 289, 292, 961 P.2d 716 (1998).

*Issues raised in this appeal*

Several questions arise in this appeal: Did V.H. preserve the ICWA issue for appeal? How should an appellate court review a CINC finding when ICWA applies? Is there substantial competent evidence to support the court's finding that S.M.H. and L.M.H. were children in need of care? Did the trial court properly apply ICWA?

The appellant has raised other issues that we do not address because we reverse.

*Is the failure to follow the ICWA properly before this court?*

V.H. admits that she failed to raise this issue in the district court. Generally, issues not raised before the trial court cannot be raised on appeal. *Board of Lincoln County Comm'rs v. Nielander,* 275 Kan. 257, 268, 62 P.3d 247 (2003). Here, appellant did not simply

fail to argue noncompliance with the ICWA, but counsel for V.H. argued before both the magistrate and the district judge that the CINC code set forth the State's burden for proving that L.M.H. and S.M.H. were CINC. Notably, a party is not to invite error and then complain of that error on appeal. *Butler County R.W.D. No. 8 v. Yates,* 275 Kan. 291, 296, 64 P.3d 357 (2003).

Although addressing V.H.'s arguments regarding the ICWA initially seems inappropriate in light of V.H.'s conduct before the magistrate and district judge, 25 U.S.C. § 1914 provides that "any parent . . . . may petition any court of competent jurisdiction to invalidate [an action for foster care placement] upon a showing that such action violated any provision of sections 101, 102, and 103 of this Act [25 U.S.C. §§ 1911, 1912, and 1913.]" 25 U.S.C. § 1912(e) requires that foster care placement of an Indian child be supported by qualified expert witness testimony that continued custody of the child by the Indian parent is "likely to result in serious emotional or physical damage to the child." This standard was not applied in this case, and it should have been.

Moreover, the State and the district court were aware that the ICWA applied once V.H. informed the court of her membership in an Indian tribe. Certainly after the Cherokee Nation filed its notice of intervention stating that L.M.H. and S.M.H. were Indian children, the State and the courts could have had no doubt that the ICWA was applicable.

Because the language in K.S.A. 2003 Supp. 38-1503(a) is clear that the CINC code does not apply to Indian children and the ICWA does, once the court was faced with evidence that S.M.H. and L.M.H. were Indian children, the court was bound to apply the ICWA in these proceedings. See, *e.g., Doty-Jabbaar v. Dallas County Child Protective Services,* 19 S.W.3d 870, 874 (Tex. Ct. App.), *rev. denied* (2000), where the court held that when considering 25 U.S.C. § 1912(a), the trial court was bound to apply the ICWA when faced with evidence that the mother is a member of an Indian tribe even though the tribe failed to intervene. See also *In re H.A.M.,* 25 Kan. App. 2d at 292 ("State court application of the federal protective measures of the ICWA is in furtherance of

the State's duty to 'preserve the unique cultural heritage and integrity of the American Indians.' [Citation omitted.]").

*How should an appellate court view a CINC finding when ICWA applies?*

Even though the two laws might deal with similar subjects—neglected children—their requirements differ. Before there can be removal of an Indian child from an Indian parent, the ICWA requires that clear and convincing evidence, supported by qualified expert witness testimony, be provided that shows continued custody of the child by the Indian parent is likely to result in serious emotional or physical damage to the child. 25 U.S.C. § 1912(e). In contrast, K.S.A. 38-1555 requires the petitioner, or the State, to "prove by clear and convincing evidence that the child is a child in need of care." There is no requirement for expert testimony.

In a case dealing with the termination of parental rights a panel of this court, while examining the different burdens of proof under the ICWA and a CINC proceeding, has adopted a two-step process utilized by another jurisdiction. The court opted to first apply the state law test for termination of parental rights and then apply the standards from the ICWA. See *In re A.P.*, 25 Kan. App. 2d at 277-78. Likewise, in *In re H.A.M.*, 25 Kan. App. 2d at 295, our court applied the state law test for termination of parental rights before applying the ICWA standard, which required evidence establishing beyond a reasonable doubt that custody by the natural Indian parent would likely result in damage to the child.

Although the State in this case did not seek to terminate V.H.'s parental rights, we will employ the two-step process utilized in *In re A.P.* and in *In re H.A.M.* to illustrate how the State's burden under the ICWA differs from that under the CINC code. Therefore, V.H.'s arguments concerning whether the State sustained its burden under the CINC code are considered first.

*Is there sufficient evidence that these are children in need of care?*

This issue has our usual standard of review. This court reviews a CINC adjudication for substantial competent evidence to support the finding. *In re H.A.M.*, 25 Kan. App. 2d at 296-97. Substantial

evidence is such legal and relevant evidence as a reasonable person would accept as sufficient to support a conclusion. *In re J.D.D.,* 21 Kan. App. 2d 871, 874, 908 P.2d 633 (1995).

In finding that L.M.H. was without the necessary care and control for her physical and emotional health on June 13-14, 2003, the trial judge noted that V.H. was so intoxicated that she did not know where L.M.H. was and could not control her return home. L.M.H. did not want to return home because of the ongoing pattern of alcohol abuse.

Deputy Pfrang testified that L.M.H. expressed her fear to him about returning home that night. L.M.H. indicated that she knew both R.N. and V.H. were drinking and did not want to be around them as they often argued and fought when they were intoxicated. In his report attached to the CINC petition, Pfrang wrote that R.N. told him he "wanted to beat up the people that [L.M.H.] was with and bring her home."

The trial judge noted that S.M.H. had to take care of her mother that night, interpreting her mother's words for law enforcement. Nonetheless, S.M.H. was also frightened and concerned with her own safety. S.M.H. told Pfrang that she wanted L.M.H. to return home in order to protect her while R.N. and V.H. were intoxicated. S.M.H. also told the social worker that R.N. and V.H. drank frequently.

At the adjudication hearing, S.M.H. testified that she was afraid for her safety or health that night. S.M.H. stated that R.N. and V.H. got "completely drunk" 4 days each week. She had witnessed physical violence between R.N. and her mother on previous occasions and feared that R.N. would possibly hit her or one of her sisters. S.M.H. also reported that V.H. had called her a "slut a few times or a whore." S.M.H. had recently run away from her foster parents; she went to her aunt's home in Holton.

Importantly, the district court reviewed the magistrate's finding that the evidence indicated V.H.'s intoxication on the night of June 13-14 was not an isolated event; rather, it was a pattern. S.M.H. described the "degrees of intoxication" she had observed of V.H. The magistrate referred as well to the demeaning language used

by the adults and the documented activity by law enforcement in responding to domestic issues and problems in the family.

We do not reweigh the evidence, substitute our evaluation of the evidence for that of the trial court, or pass upon the credibility of the witnesses. *In re H.A.M.,* 25 Kan. App. 2d at 297. Viewing the evidence in the light most favorable to the State, substantial competent evidence in the record supports the district judge's finding that the children were without the care and control necessary for their physical, mental, or emotional health.

*Was ICWA ever applied properly in this case?*

The ICWA requires that "clear and convincing evidence," including expert testimony, be presented that "the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." 25 U.S.C. § 1912(e). V.H. argues the absence of a finding of abuse or neglect, coupled with the magistrate's comments that V.H. had shown emotional love and caring for the two children, indicates the State failed to sustain its burden of proof under the ICWA. We agree.

The Bureau of Indian Affairs (BIA) published detailed guidelines for the assistance of state courts in implementing the ICWA. See Department of the Interior-Bureau of Indian Affairs Guidelines for State Courts; Indian Child Custody Proceedings, 44 Fed. Reg. 67,584 (Nov. 26, 1979). Our court has previously looked to the Guidelines when interpreting the ICWA. See *In re H.D.,* 11 Kan. App. 2d 531, 535, 729 P.2d 1234 (1986). As applicable to this case, the Guidelines describe what constitutes clear and convincing evidence that continued custody is likely to result in serious emotional or physical damage to the children under the ICWA:

"Evidence that only shows the existence of community or family poverty, crowded or inadequate housing, alcohol abuse, or non-conforming social behavior does not constitute clear and convincing evidence that continued custody is likely to result in serious emotional or physical damage to the child. To be clear and convincing, the evidence must show the existence of particular conditions in the home that are likely to result in serious emotional or physical damage to the particular child who is the subject of the proceeding. The evidence must show the causal relationship between the conditions that exist and the damage that is likely to result." 44 Fed. Reg. 67,593 (1979).

Commentary to the Guidelines elaborates:

"A child may not be removed simply because there is someone else willing to raise the child who is likely to do a better job or that it would be 'in the best interests of the child' for him or her to live with someone else. Neither can a placement or termination of parental rights be ordered simply based on a determination that the parents or custodians are 'unfit parents.' It must be shown that it is dangerous for the child to remain with his or her present custodians. Evidence of that must be 'clear and convincing' for placements and 'beyond a reasonable doubt' for terminations." 44 Fed. Reg. 67,593.

Here, the magistrate simply ruled that clear and convincing evidence had been presented to show that S.M.H. and L.M.H. were children in need of care "as defined by state law." The district judge in turn concluded that clear and convincing evidence supported the magistrate's ruling.

Further, the State failed to present "qualified expert testimony" in support of a finding that continued custody by V.H. would result in serious damage to the children's emotional or physical health. See 25 U.S.C. § 1912(e); *In re S.M.*, 508 N.W.2d 732, 734 (Iowa Ct. App. 1993) (expert witness testimony meant to provide court with knowledge of social and cultural aspects of Indian life to diminish risk of any cultural bias). Again, the BIA Guidelines provide guidance as to what constitutes expert testimony to be admitted at a foster care placement proceeding:

"(a) Removal of an Indian child from his or her family must be based on competent testimony from one or more experts qualified to speak specifically to the issue of whether continued custody by the parents or Indian custodians is likely to result in serious physical or emotional damage to the child.

"(b) Persons with the following characteristics are most likely to meet the requirements for a qualified expert witness for purposes of Indian child custody proceedings:

(i) A member of the Indian child's tribe who is recognized by the tribal community as knowledgeable in tribal customs as they pertain to family organization and childrearing practices.

(ii) A lay expert witness having substantial experience in the delivery of child and family services to Indians, and extensive knowledge of prevailing social and cultural standards and childrearing practices within the Indian child's tribe.

(iii) A professional person having substantial education and experience in the area of his or her speciality." 44 Fed. Reg. 67,593.

The State presented the testimony of the officers who removed S.M.H. and L.M.H. from the custody of V.H. Also testifying at the hearing were the children, V.H., R.N., two other daughters of V.H., and Beverly Rosell. Rosell stated she worked at the Wamego SRS office. No further foundational evidence was submitted to qualify Rosell as an expert witness. As well, Rosell did not testify that evidence existed to support the State's burden under the ICWA for placing S.M.H. and L.M.H. into foster care.

The State counters that the language in 25 U.S.C. §1912(e) applies only to the "disposition" stage of a CINC code proceeding when the court determines where to place a child after making a CINC determination. We disagree. See K.S.A. 38-1556; 38-1563. The State posits that V.H. only appealed the CINC adjudication because a "formal disposition" of the case had not occurred when the district court reviewed the magistrate's decision. Since a "formal disposition" of the case had not occurred, the State also maintains the court had not yet been required to make a finding in conformity with the ICWA.

We are not persuaded by this argument because of the time limits involved. The Guidelines make clear that

"absent extraordinary circumstances, temporary emergency custody shall not be continued for more than 90 days without a determination by the court, supported by clear and convincing evidence and the testimony of at least one qualified expert witness, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." 44 Fed. Reg. 67,589.

The magistrate here first found cause to place the children outside of V.H.'s home at the temporary custody hearing on June 17, 2003. The CINC hearing was held on September 8, 2003, after which additional evidence was submitted so as to continue placement of the children outside of V.H.'s home. The district court entertained arguments in reviewing the magistrate's CINC determination on October 7, 2003.

According to the Guidelines, a finding in compliance with the ICWA standard was required to have been made approximately September 17, 2003. Here, a disposition hearing was set for November 13, 2003, and then continued to December 18, 2003. The

State fails to point to any finding by the magistrate or district court in satisfaction of the State's burden for compliance with the ICWA. The standards of proof established by the ICWA were not satisfied.

*Is there substantial compliance here with ICWA? Did the district court commit harmless error?*

V.H. argues the court committed plain error when it failed to apply the ICWA standard for placing the children in foster care, pointing to Rosell's testimony that allegations of physical and emotional abuse of the children were unsubstantiated. Rosell responded as follows to questions posed by V.H.'s counsel:

"Q. Did uh, you you're making an investigation as to the concern that, uh, there was drinking and arguing in the home environment?

"A. That was just addressed in the assessment. That wasn't assigned as part of the, necessarily a specific part of the abuse and neglect allegations.

"Q. Okay. Did you make any, uh, form any opinions as to, uh, the uh, extent of those, of that, or the severity of that concern?

"A. Of which?

"Q. Of the concern of drinking and arguing in the home environment?

"A. That was related to, somewhat to the emotional abuse, and that was, that concern, um, didn't rise to the level to be considered abuse, so that was, was unsubstantiated.

"Q. Okay. Unsubstantiated as to it being rising to the level . . . I'm sorry. What was that again?

"A. Of being abuse or neglect?

"Q. Okay. Did it rise to the level of functionally impairing the children?

"A. That was, it was determined to be unsubstantiated.

"Q. Okay, so it did not even rise to the level of impairing the children?

"A. That, if, if it did, that we could find evidence, it would have been unsubstantiated.

"Q. Okay, um, and did you make any determination as to whether [L.M.H.] or [S.M.H.] were emotionally abused?

"A. That was unsubstantiated."

The State counters that substantial competent evidence was presented in support of the ICWA standard during and immediately following the CINC adjudication. Deputy Pfrang testified that he did not believe V.H.'s home provided a safe environment for the children. Once the magistrate found L.M.H. and S.M.H. to be CINC, he received testimony from Randall Cowley, a therapist with the Pottawatomie Indian Nation. Although V.H. was a mem-

ber of the Cherokee Nation, she sought and received services from the Pottawatomie Indian Nation. Cowley stated he had provided therapy to L.M.H., S.M.H., V.H., and R.N. He testified about the progress made in family therapy and addressed V.H.'s and R.N.'s drinking patterns. He did not express any surprise that V.H. and R.N. had relapsed to drinking and predicted such a relapse could occur again. Cowley's testimony did not specifically address whether continued custody by V.H. would have resulted in serious emotional or physical harm to S.M.H. and L.M.H.; however, he stated that only L.M.H. was ready to return to V.H.'s home.

The State reported that V.H. was no longer attending AA meetings because R.N. refused to provide her with transportation. The State also informed the court that two domestic-related calls had been received by law enforcement for V.H.'s residence since the children's removal from the home. One report involved an adult daughter receiving medical treatment after being struck with a mug. The State recommended the children not be returned to the household as a continuing danger existed.

Kansas courts have previously dealt with proceedings where the ICWA was not strictly applied. In *In re Adoption of Baby Boy L.*, 231 Kan. 199, 643 P.2d 168 (1982), our Supreme Court considered the applicability of the ICWA to a state adoption proceeding where the illegitimate child to be adopted was a member of an Indian tribe. The mother was non-Indian and the putative father was five-eighths Kiowa Indian. In affirming the trial court's decision not to apply the ICWA the Supreme Court considered the expressed policy behind the adoption of the ICWA:

"A careful study of the legislative history behind the Act and the Act itself discloses that the overriding concern of Congress and the proponents of the Act was the maintenance of the family and tribal relationships existing in Indian homes and to set minimum standards for the removal of Indian children from their existing Indian environment. *It was not to dictate that an illegitimate infant who has never been a member of an Indian home or culture, and probably never would be, should be removed from its primary cultural heritage and placed in an Indian environment over the express objections of its non-Indian mother.*" (Emphasis added.) 231 Kan. at 205-06.

In a different case, *In re H.D.*, 11 Kan. App. 2d 531, the issue before the court was not whether the ICWA was applicable to the

proceedings; rather, the court was concerned with the tribe's right to notification of involuntary proceedings where reasonable grounds existed that the child subject to the proceedings was or could have been an Indian child. This court invalidated the termination of parental rights after concluding the lower courts failed to direct notice be given in accordance with ICWA when reasonable grounds existed to believe the children involved in the proceeding were or could have been Indian children. 11 Kan. App. 2d at 538-39.

However, in another case, *In re H.A.M.*, 25 Kan. App. 2d 289, 961 P.2d 716 (1998), a panel of this court held the trial court's failure to give notice to the Chickasaw Nation regarding a CINC proceeding did not necessitate reversal of the case where the tribe ultimately became involved in the proceedings. 25 Kan. App. 2d at 294-95. In *In re H.A.M.*, the children *had been adjudicated as CINC and in out-of-home placements for over a year* when the State filed a motion to terminate parental rights. Subsequently, the natural mother filed a motion to transfer the case to tribal court. The trial court determined the children were Indian children and that ICWA applied. A representative of the Chickasaw Nation thereafter participated in devising a new case plan. After the parents failed to comply with the case plan, the representative indicated the Chickasaw Nation supported SRS's motion to terminate parental rights. 25 Kan. App. 2d at 290-91.

In *In re H.A.M.*, the parents argued the trial court erred by failing to follow the notice provisions of the ICWA. The Chickasaw representative testified that he had no knowledge of the CINC proceedings. He also testified that the Chickasaw Nation declined transfer of the case to tribal court. Our court found that the trial court erred by not giving notice to the tribe of the CINC proceedings. This court also attached credence to the parents' argument that the lapse in notifying the tribe left little time to work with the Chickasaw Nation in an attempt to preserve the family. Additionally, the children were not placed with Indian foster parents.

The *H.A.M.* court also stated that the tribal representative had assisted in the development of a case plan, which the tribe deemed to be appropriate, designed to reintegrate the children to their

home. While the Nation did not transfer the case to its jurisdiction, it "intervened in the direction of the case." The court concluded:

"Considering the Chickasaw Nation's involvement in this case, albeit belated, there was substantial compliance with the ICWA purpose of involving the tribe in the child care proceedings. Of great importance is the apparent belief by the Chickasaw Nation that the trial court remedied the initial failure to give notice with its subsequent actions." 25 Kan. App. 2d at 294-95.

In a more recent case, *In re J.J.G.*, 32 Kan. App. 2d 448, 83 P.3d 1264 (2004), a non-Indian father appealed the trial court's termination of his parental rights as to J.J.G. Shortly after the father was convicted of one count of rape and five counts of sexual exploitation of J.J.G., J.J.G. was adjudicated to be a CINC and ordered to remain in out-of-home placement. Subsequently, the Crow Tribe licensed the Indian mother's maternal half-sister and brother-in-law to care for J.J.G. A permanency plan called for placement consistent with the Tribe's license and with the goal of reintegration with the Indian mother. The Tribe did not appear or participate in the hearing where father was deemed unfit.

Father claimed the trial court failed to comply with the ICWA requirements regarding notice and the ICWA evidentiary burden for termination of parental rights. This court found the Tribe's actual participation in all custody proceedings regarding the child, including scheduling for the termination proceedings, rendered father's notice argument unpersuasive.

The parties conceded that the evidentiary burden of proof set forth in the ICWA was not applied or that qualified expert witnesses had not testified at the proceeding. Nonetheless, in consideration of the policies underlying the ICWA, this court concluded that literal compliance with the ICWA's evidentiary requirements was unnecessary "because the Tribe elected not to challenge the termination of parental rights, and termination of the non-Indian parent's rights was consistent with reintegration of the child with his or her native heritage." 32 Kan. App. 2d at 453.

*In re Adoption of Baby Boy L.*, 231 Kan. 199, dealt with an adoption case and much different facts than this case. *In re H.D.*, 11 Kan. App. 2d 531, invalidated a termination of parental rights for failure to give notice to the Indian tribe. *In re H.A.M.*, 25 Kan.

App. 2d 289, focusing on the facts, would not set aside a CINC adjudication where the appropriate Indian nation participated in the case plan and supported termination. And finally, in *In re J.J.G.,* 32 Kan. App. 2d 448, the ultimate placement of the child was consistent with the Tribe's license. The protection afforded by the ICWA was utilized in the last three cases. No such protection was afforded in this case.

Congress adopted the ICWA to address concerns regarding the high incidence of Indian families separated by the often unwarranted removal of Indian children by nontribal public and private agencies. 25 U.S.C. § 1901(4). The Guidelines interpret the three major purposes of the Act as (1) "clear preference for keeping Indian children with their families"; (2) "deferring to tribal judgment on matters concerning the custody of tribal children"; and (3) "placing Indian children who must be removed from their homes within their own families or Indian tribes." 44 Fed. Reg. 67,585-86.

The Cherokee Nation was notified of the dispositional hearings set for November 13 and December 18, 2003. Howard Paden of the Cherokee Nation's Social Services attended the November 13 disposition, which convened briefly before being continued to December 18, 2003. Upon hearing of the plans for reunification of the children with V.H. on December 18, Paden commented:

"I think that we've, I'd like to reiterate that the mother needs to finish her case plan. I know a lot of time when you see a light at the end of tunnel you think that you've already won the battle, but that does need to be finished, so if everything goes well I believe the eighteenth would be a very positive reunification to the family."

On March 15, 2004, a report from the Cherokee Nation was filed, indicating that it would no longer be actively involved while the children remained in the custody of the parent. Nevertheless, the Nation requested to continue receiving all legal documentation until the case was closed and to be notified should the children return to SRS custody so that it could again become involved in the proceeding.

Finally, documentation supports that the goal was reunification with V.H., thus, that S.M.H. and L.M.H. be returned to their In-

dian family. The case plan goal of July 7, 2003, was reunification. Ultimately, the children were returned to V.H.'s household, and SRS custody of the children was terminated.

V.H. was entitled to the protection of the higher evidentiary standards set by the ICWA. We cannot say with any certainty that the outcome of this case would have been the same if expert testimony had been received, nor can we conclude that this error is harmless. Harmless error is error which does not prejudice the substantial rights of a party. *Smith v. Printup*, 262 Kan. 587, 603. 938 P.2d 1261 (1997). Since this CINC finding makes it easier to remove V.H.'s children in the future, V.H's rights as a mother are affected. We cannot view this as harmless.

Since we are reversing the finding that these were children in need of care, we need not address the remainder of V.H's arguments.

Reversed.