NOT DESIGNATED FOR PUBLICATION

Nos. 113,871
113,872
113,873
113,874

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of A.R.B., M.G.T., O.P.A.T., and K.M.T.,
Minor Children Under the Age of Eighteen.

MEMORANDUM OPINION

Appeal from Butler District Court; KRISTIN H. HUTCHISON, judge. Opinion filed May 20, 2016.
Affirmed.

*Joshua S. Andrews*, of Cami R. Baker & Associates, P.A., of Augusta, for appellants.

*Joseph M. Penney*, assistant county attorney, for appellee.

Before HILL, P.J., PIERRON and GARDNER, JJ.

*Per Curiam*: The district court ruled that two girls and two boys were children in need of care, removed them from their parents' care, and placed them in State custody. In this consolidated appeal of the four cases, H.T.B., the mother of the children whose initials appear in the caption, and J.B., the father of A.R.B. and stepfather of the other children, claim the district court erred in determining that the children were in need of care. The evidence in the record supports the court's decision and we affirm.

1

*All four children were adjudicated as children in need of care.*

H.T.B. is the mother of four children whose initials are K.M.T., O.P.A.T., M.G.T., and A.R.B. They were born in 1998, 2002, 2005, and 2013 respectively. J.B. is A.R.B.'s father. Mother has another daughter, W.T., who was already in foster care when these cases began. In October 2014, Mother and J.B. married, and J.B. became K.M.T., O.P.A.T., W.T., and M.G.T.'s stepfather.

After W.T. learned that Mother had married J.B., she wrote a letter to her father, J.T., claiming that J.B. had sexually abused her. As a result of W.T.'s letter and the investigation that followed, the police filed a protective custody affidavit. K.M.T., O.P.A.T., and M.G.T. were placed with J.T., and A.R.B. was placed outside the home. The State alleged that the children were without adequate parental care, control, or subsistence not solely due to the lack of financial means, without the care or control necessary for their health, and had been abused or neglected.

At the adjudication hearing, the school resource officer who interviewed K.M.T., O.P.A.T., and M.G.T. testified. K.M.T. reported that J.B. had sexually abused her but could not describe a specific incident. She said that J.B. had touched her under her clothes and while she was naked. He touched her with his hands and his penis, forcing it into her vagina. K.M.T. was emotional while speaking with the officer, crying as she spoke and hiding her face.

The officer had K.M.T. use anatomical dolls to demonstrate what had happened. She took the clothes off the dolls and placed the boy doll on top of the girl doll. K.M.T. also told the officer that J.B. once tried to get O.P.A.T. to perform oral sex on him, but O.P.A.T. would deny it. According to K.M.T., J.B. was abusive and emotionally hurtful. He had also thrown drinks at her and called her obscene names.

2

When the officer spoke with O.P.A.T., she, as K.M.T. predicted, denied any sexual abuse. O.P.A.T. was also uncomfortable talking about male anatomy. She refused to name the male body parts, other than stating it begins with a "d." O.P.A.T. also mentioned an incident when she was watching TV and J.B. walked by without any clothes on. But she did not indicate there was anything sexual about the encounter.

M.G.T. was also interviewed. Talking about different body parts embarrassed him and he was reluctant to answer the officer's questions. When asked about sexual abuse, M.G.T. denied being touched inappropriately or being made to touch someone else.

A social worker with the State of Kansas also testified at the adjudication hearing. She testified that the family had 19 prior intake reports. One intake occurred in 2012, after K.M.T. alleged that J.B. had sexually abused her, which the Department of Children and Families (DCF) substantiated. In an interview, K.M.T. disclosed that J.B. would take her from her room and bring her to Mother's bed. And while Mother was sleeping, J.B. would have sex with K.M.T. This happened five times, beginning when K.M.T. was 11 or 12 years old. Police investigated, but no charges were filed.

A DCF special investigator testified that on the same day K.M.T., O.P.A.T., and M.G.T. were interviewed, she interviewed W.T. W.T. reported a specific incident where J.B. had sex with her and O.P.A.T. Mother had left to take one of W.T.'s friends home, and J.B. told W.T. and O.P.A.T. to take their clothes off and go into the bedroom. The girls found J.B. lying on the bed without any clothes. He had the girls get into bed with him. He rolled over on top of W.T. and had sexual intercourse with her, which she described as placing his penis in her vagina. She noticed that J.B. had a tattoo of a mermaid.

J.B. then had W.T. get up and put her clothes back on before Mother got home. And although she did not see anything, W.T. believed that J.B. also had sex with

3

O.P.A.T., who had remained in the bedroom. She later saw O.P.A.T. crying. At some point, W.T. said J.B. had a gun and threatened to kill her and her family if she told anyone what happened. W.T. told the DCF investigator that she was coming forward because K.M.T. told her that J.B. was abusing her and Mother did not believe her.

A police investigations supervisor also testified at the adjudication hearing. When K.M.T., O.P.A.T., and M.G.T. were taken to their father's house, the investigations supervisor spoke with their stepmother, T.T. She told him about the letter that W.T. had sent her father. The letter also contained a suicide threat. And according to the stepmother, K.M.T. had also made some suicidal threats.

The investigations supervisor also interviewed Mother. She denied that any abuse had occurred, and claimed that J.B. was never alone with the girls, even though they were married. She said that J.B.'s relationship with the kids was stressed. She also claimed that J.B. was physically endowed and would have injured the girls had he had sex with them. But Mother did admit that J.B. has a tattoo on his shoulder that could be consistent with W.T.'s description of a mermaid tattoo.

J.B. was also interviewed. He agreed with Mother and said he had, for the most part, not been alone with the children. He also felt that the allegations were going to make him sick. J.B. admitted that he had a stressed and argumentative relationship with the children.

W.T.'s foster mother testified. She testified that before a visit, W.T. asked that J.B. not be present, but then at the visit W.T. asked that J.B. join the rest of family, even giving him a hug. When she asked W.T. about this, W.T. said "nothing's really happened." W.T. said she was not afraid to be around J.B. but did not clarify what she meant by nothing happened. Her foster mother took her statement to mean nothing ever

4

happened. According to W.T.'s foster mother, W.T. first said "that it happened. Then it didn't happen. And then it did again happen."

Mother also testified at the adjudication hearing. She discussed K.M.T.'s 2012 allegation of sexual abuse. She was contacted by a counselor at a hemophilia treatment center camp who told her that K.M.T. had disclosed to another child that J.B. had sexually assaulted her. Mother took K.M.T. to the hospital and contacted the police. A few months later, the police informed Mother that the investigation had ended. She did not learn that DCF had substantiated the allegation until later. Mother believed that K.M.T. had recanted during counseling.

According to Mother, J.B. did not have contact with K.M.T. during the investigation. Before J.B. moved back in with the family, Mother spoke with K.M.T., and K.M.T. did not object to J.B. moving back in. Mother testified that they were a normal family. But she also admitted that J.B. could be verbally abusive, although she was not concerned. She claimed that the girls taunted J.B. and he was sensitive to taunting. She also said that J.B. and the girls bickered back and forth.

Mother also testified that W.T. had attempted suicide in 2014, and that K.M.T. had a history of cutting herself. W.T. has also suffered from panic attacks. Mother admitted that the panic attacks could be a sign of abuse but later clarified that she meant abuse from the girls' father, J.T. In the end, while she initially believed them, Mother testified that she believed her children were lying about being abused.

Finally, W.T. testified. Over their objection, Mother and J.B. were removed from the courtroom during W.T.'s testimony, as well as everyone who was not an attorney. W.T. confirmed that she had sent a letter to her father in which she made allegations against J.B. She also admitted that she had lied about J.B. threatening her with a gun. But

5

she reaffirmed that J.B. had sexually abused her and claimed that the rest of the details she shared with the DCF investigator were true.

W.T. did testify that she wished she could put people she hated in jail by saying bad things about them, and she admitted that she hated J.B. But the reason she dislikes J.B. is because he has abused her family. According to W.T., J.B. has also been physically abusive toward the children and Mother. W.T. claimed that J.B. hit and attacked her, the other children, and Mother, including when she was pregnant with A.R.B. J.B. would also say mean things to W.T., her sisters, and Mother. W.T. testified that she and her sisters would say mean things back but Mother would not.

After hearing testimony and the parties' arguments, the district court decided that K.M.T. and O.P.A.T. were children in need of care, citing not only the sexual abuse but the verbal and physical abuse. The court also noted the children's volatile relationship with their father, J.T. After argument from the State and the children's guardian ad litem, the district court also found that M.G.T. and A.R.B. were children in need of care under K.S.A. 2015 Supp. 38-2202(d)(11).

The district court issued separate journal entries reflecting the disposition of the adjudication hearing. A.R.B. and M.G.T.'s journal entries indicated that they resided with a sibling who had been abused. The journal entries for K.M.T. and O.P.A.T. stated that they were without parental care, control, or subsistence, without the care or control necessary for their health, and had been abused or neglected.

*This case is not moot.*

The first issue is whether this case is moot. Because the children's district court cases have been closed and they have been released from the State's custody, the State claims that a justiciable controversy no longer exists. The State believes that the case

6

does not present a justiciable controversy because "there are no immediate or real adverse legal interests amenable to conclusive relief."

But a case is not necessarily moot just because the children have been released from State custody. See *In re S.M.H.*, 33 Kan. App. 2d 424, 427-28, 103 P.3d 976 (2005), *rev. denied* 279 Kan. 1006 (2005). As we noted in *In re S.M.H.*, a CINC adjudication can have a dramatic effect on a parent's ability to defend against a claim of unfitness because K.S.A. 38-1585(a)(3) (now codified as K.S.A. 2015 Supp. 38-2271[a][3]) creates a presumption of unfitness when a child has been found in need of care on two or more previous occasions. 33 Kan. App. 2d at 427-28. Likewise, this case is not moot.

*The record supports the district court's decision.*

When reviewing the district court's determination that a child is in need of care, an appellate court "should consider whether, after review of all the evidence, viewed in the light most favorable to the State, it is convinced that a rational factfinder could have found it highly probable, *i.e.*, by clear and convincing evidence, that the child was a CINC." *In re B.D.-Y.*, 286 Kan. 686, 705, 187 P.3d 594 (2008). We do not "weigh conflicting evidence, pass on credibility of witnesses, or redetermine questions of fact." 286 Kan. at 705. As the petitioner, the State bears the burden of proving that a child is need of care. K.S.A. 2015 Supp. 38-2250.

K.S.A. 2015 Supp. 38-2202(d) provides the statutory definition of "child in need of care." As mentioned, the district court in this case found K.M.T. and O.P.A.T. in need of care, as defined by K.S.A. 2015 Supp. 38-2202(d)(1)-(3), because they were without parental care, control, or subsistence, without the care or control necessary for their health, and had been abused or neglected. A.R.B. and M.G.T. were adjudicated as children in need of care under K.S.A. 2015 Supp. 38-2202(d)(11)—they were residing with a sibling who has been abused or neglected.

7

The record shows that evidence of sexual abuse was presented at the adjudication hearing. K.M.T. disclosed that J.B. had abused her, using anatomical dolls to describe the abuse. She had also made a previous allegation of sexual abuse in 2012. No charges were filed, but DCF did substantiate the allegation. W.T. also alleged that she had been sexually abused by J.B. She admitted she lied about J.B. threatening her and her family with a gun, but she testified the other details of the abuse were true.

Mother's and J.B.'s argument on appeal is essentially that the evidence of sexual abuse was not clear and convincing, pointing out that O.P.A.T. denied that any abuse occurred, and charges were not filed after K.M.T.'s 2012 allegation of abuse. W.T.'s allegations came forward only after she learned Mother and J.B. had married, W.T. lied about J.B. having a gun, and W.T.'s foster mother testified that W.T. vacillated between saying something happened and nothing happened. But Mother and J.B. are essentially asking us to reweigh the evidence and reconsider witness credibility, which we are prohibited from doing. See *In re B.D.-Y.,* 286 Kan. at 705.

Even if we were to find that the evidence of sexual abuse was not clear and convincing, the record still shows that evidence of emotional and physical abuse was presented. K.M.T. alleged that J.B. was verbally and emotionally abusive. She also claimed that J.B. had thrown drinks at her. Mother testified that J.B. was at times verbally abusive. W.T. also testified that J.B. was physically and verbally abusive. And because the record shows that K.M.T. and O.P.A.T. were abused, the record also shows that M.G.T. and A.R.B. were residing with siblings who had been abused.

Finally, the record shows that evidence of a lack of parental care and the care necessary for the children's health was also presented. Mother married a man that her daughter alleged had sexually abused her. She also knew the man had a stressed and argumentative relationship with her children and that he could be verbally abusive. Still, Mother believes that her children are lying about being abused.  Further, the children

have displayed signs of stress. Both W.T. and K.M.T. have made suicidal threats. W.T. has attempted suicide and K.M.T. has a history of cutting herself. W.T. has also had panic attacks.

Therefore, the evidence, when viewed in the light most favorable to the State, provides clear and convincing evidence that K.M.T., O.P.A.T., M.G.T., and A.R.B. are children in need of care.

Affirmed.