NOT DESIGNATED FOR PUBLICATION

No. 116,103
116,104
116,105

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of D.E.J., R.E.J., and P.E.J.,
Minor Children.

MEMORANDUM OPINION

Appeal from Butler District Court; KRISTIN H. HUTCHISON, magistrate judge. Opinion filed April 21, 2017. Reversed and remanded with directions.

*Joshua S. Andrews*, of Cami R. Baker & Associates, P.A., of Augusta, for appellant.

*Joseph M. Penney*, assistant county attorney, for appellee.

Before GARDNER, P.J., PIERRON and ATCHESON, JJ.

*Per Curiam*: The State initiated an emergency removal of D.G.J.'s (Father's) three children after he took two of the children to the hospital claiming they had worms crawling in and out of their skin. There were no worms. Three months later, at an adjudication hearing, the district court found there was clear and convincing evidence the children were in need of care and they should not be returned to Father. Father challenges the court's ruling from the adjudication hearing.

Two of the children are enrolled members of the Cow Creek Band of the Umpqua Tribe of Indians, and the third child is an eligible member. The Indian Child Welfare Act (ICWA) establishes two ways for the State to remove children from their parents. Emergency removal is appropriate when the children face imminent physical damage or

1

harm. The other method of removal requires two things:  (1) the State must show that it has engaged in active efforts to rehabilitate the family before removal; and (2) the court must have clear and convincing evidence, including expert witness testimony, that continued custody by the parent is likely to result in serious emotional or physical damage to the children. The State did not prove the children faced imminent physical danger at the time of the adjudication hearing. The State also did not prove that it had made active efforts to reunite the family before requesting continued removal. We reverse.

On December 8, 2015, the State filed petitions alleging that D.E.J., R.E.J., and P.E.J. were children in need of care. The State alleged that the children were "without adequate parental care, control or subsistence and it [was] not due solely to the lack of financial means of the [children's] parents or other custodian" and that the children were "without the care or control necessary for the [children's] physical, mental, or emotional health." Additionally, D.E.J. and R.E.G.'s petitions alleged they were not attending school. The factual basis for the petition was that Father had taken the children to the hospital claiming that they had worms crawling out of their skin, when in fact there were no worms. This gave rise to the concern that Father was under the influence of drugs. Additionally, the petition alleged the children were not wearing the proper attire for the cold weather. Finally, two petitions stated that school officials had been trying to contact the parents because the children had not attended school for several weeks.

The district court conducted a temporary custody hearing on the day the petitions were filed. This hearing is not a part of the record on appeal. The journal entry and order of temporary custody show the court found the children's health and welfare were at risk due to concerns regarding possible drug use by Father. The court ordered the children placed into the temporary custody of the State. The court scheduled an adjudication hearing for January 2016, but it was continued to March 3, 2016.

On March 1, 2016, Father filed a motion to invalidate the district court's ruling from the temporary custody hearing. Father alleged the court had failed to comply with the Indian Child Welfare Act. He argued that although the State contacted the tribe by email and phone, it did not strictly comply with the ICWA because it did not send notice to the tribe by registered mail. Father also argued there was no clear and convincing evidence supported by expert testimony that continued custody with the natural parents would result in serious emotional or physical damage to the children. The court continued the adjudication hearing to March 8, 2016, "to allow the Court time to review the motion and to allow the State time to attempt to acquire testimony from a Tribal Expert."

On the day of the adjudication hearing, the State reported that one of its witnesses, the law enforcement officer who brought the children into protective custody, was unable to testify due to having knee surgery the day before. The court decided to proceed with the witnesses who were present and continue the adjudication until the officer could be present.

The first witness was Andrea Davis, the ICWA expert witness for the Cow Creek Band of Umpqua Tribe of Indians. She became aware of the child in need of care proceeding when Father called her and asked if the tribe could help him. Davis said Father was acting odd when he called, and "[h]e was explaining that he had bugs coming out of his skin . . . ." Davis said Father told her he went to the hospital to take care of the bugs, but he did not mention that he thought the children had bugs also. Davis testified that one of her main concerns with reintegration was that no one from the State had checked Father's house. As she explained, "we don't know if there's proper shelter, food available, we don't know what type of home life they're living." Davis also expressed concern regarding drug use, but said she had "noticed a complete change in [Father] and . . . I think he's really come along." The State asked Davis whether she thought it would be hazardous to the children's physical or emotional health at that time to be placed back with the parents. Davis responded she "really couldn't say" because there had not been a

home check. However, Davis did believe that Father's behavior created extraordinary circumstances that justified the initial taking of the children.

Monica Ross, director of operations for Assured Occupational Solutions, was the next witness. She presented records of Mother and Father's drug tests. The parents first came in for drug testing on December 8, 2015. Mother's urine and hair tests were positive for amphetamine and methamphetamine. Her hair test revealed a starting methamphetamine level of 9,647. Father's urine test was positive for amphetamines, methamphetamine, oxycodone, and oxymorphone. He had shaved his entire body, so the laboratory was unable to collect hair for a hair test. But, Father's urine test showed a methamphetamine level of over 10,000. The next drug test was on February 2, 2016. Again, Mother's hair and urine tests were positive for amphetamine and methamphetamine. The methamphetamine levels in her hair had dropped to 799. Father had not yet grown enough hair for a hair test, but his urine test was positive for amphetamine, methamphetamine, oxycodone, and oxymorphone. On March 3, 2016, both parents' urine tested negative for drugs.

The adjudication hearing continued on April 5, 2016. Sergeant Mike Holton testified he had been dispatched to Susan B. Allen Hospital after medical staff reported concerns about a man and two children who had come into the emergency room. Sergeant Holton spoke with Father who explained he thought that worms were crawling out of his and the children's skin. Sergeant Holton did not observe any worms, although Father showed him spots on his finger and foot where he claimed worms were crawling out of his skin. Sergeant Holton did observe something that appeared to be sock fuzz at the location Father pointed to on his foot. Sergeant Holton later testified that Father "appeared to be under the influence of something." The hospital staff reported that Father did have scabies.

4

Mother had dropped off Father and two of their children at the hospital. She and her son then went to Wal-Mart to get food for the family. Sergeant Holton spoke to Mother when she returned to the hospital. Mother reported she had "Googled tape worms on the internet." At that point, Sergeant Holton told Mother he would be taking the children into protective custody because he was concerned for the welfare of the children. Sergeant Holton did not think Mother was under the influence of anything when he spoke to her. However, he did not want to send the children home with Mother because "if she had already Googled tape worms, [his] fears [were] that they would try to take their own action with the children and the children could be harmed." Sergeant Holton was also concerned that none of the children were wearing coats, despite it being the first week of December. But, he testified that the children did not show any signs of abuse.

Mother testified she did not believe anything was wrong with the three children, but she had taken Father and two of the children to the hospital because Father wanted to make sure they got checked out. Mother explained that Father was concerned about worms because their dog had been dewormed and the children slept with the dog. Mother testified the children had winter clothing in the car, but they did not want to wear it. She had dropped off Father and the two children near the entrance of the hospital, which meant they would only be exposed to the cold weather for a short time.

The magistrate judge ruled there was clear and convincing evidence the children were children in need of care when the petition was filed. The judge based her ruling on Father's claim that worms were coming out of his skin, the drug tests were positive for meth, and "some other things at the temporary custody hearing that were brought out. . . ." This included that Mother indicated Father had anger issues, he took prescription drugs that weren't his, and Mother said she could not make the older children go to school. The judge also found the facts presented extraordinary circumstances that required continued removal.

5

Father appeals the findings from the adjudication hearing.

Father makes two arguments that the magistrate judge failed to comply with the ICWA. First, he argues the State failed to prove it had engaged in active efforts to prevent breaking up the family. Second, he argues the judge did not have clear and convincing evidence, including the testimony of a qualified expert witness, that returning custody of the children to him would result in serious emotional or physical damage.

Whether the magistrate judge complied with the ICWA is a question of statutory interpretation. *In re M.K.*, No. 113,961, 2015 WL 9459829, at *5 (Kan. App. 2015) (unpublished opinion). Interpretation of a statute is a question of law over which appellate courts have unlimited review. *Neighbor v. Westar Energy, Inc.*, 301 Kan. 916, 918, 349 P.3d 469 (2015).

The Kansas Code for the Care of Children governs proceedings concerning children in need of care, "except in those instances when the court knows or has reason to know that an Indian child is involved in the proceeding, in which case, the ICWA of 1978, 25 U.S.C. § 1901 et seq., applies." K.S.A. 2016 Supp. 38-2203(a). The ICWA establishes how the State can effectuate a foster care placement or terminate parental rights. The ICWA defines "foster care placement" as "any action removing an Indian child from its parent . . . for temporary placement in a foster home or institution or the home of a guardian or conservator where the parent . . . cannot have the child returned upon demand, but where parental rights have not been terminated." 25 U.S.C. § 1903(1)(i) (2012). Here, the State removed the Indian children from their parents for temporary placement elsewhere. The parents cannot have their children returned upon demand. So, the ICWA rules for foster care placement apply.

Under the ICWA foster care placement can only be ordered if the court makes a "determination, supported by clear and convincing evidence, including testimony of

6

qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." 25 U.S.C. § 1912(e) (2012). Additionally, before seeking to effectuate a foster care placement, the State is required to show the court that it has made "active efforts . . . to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful." 25 U.S.C. § 1912(d) (2012).

There is one exception to the foster care placement rules—emergency removal:

"Nothing in this subchapter shall be construed to prevent the emergency removal of an Indian child who is a resident of or is domiciled on a reservation, but temporarily located off the reservation, from his parent or Indian custodian or the emergency placement of such child in a foster home or institution, under applicable State law, in order to prevent imminent physical damage or harm to the child. The State authority, official, or agency involved shall insure that the emergency removal or placement terminates immediately when such removal or placement is no longer necessary to prevent imminent physical damage or harm to the child and shall expeditiously initiate a child custody proceeding subject to the provisions of this subchapter, transfer the child to the jurisdiction of the appropriate Indian tribe, or restore the child to the parent or Indian custodian, as may be appropriate." 25 U.S.C. § 1922 (2012).

25 U.S.C. § 1922 shows that the State is not required to make active efforts to prevent the breakup of the family if emergency removal of a child is necessary to prevent imminent physical damage to the child. However, when the threat of imminent physical damage subsides the State must comply with the active efforts requirement to continue removal.

The Bureau of Indian Affairs (BIA) Guidelines add more detail to this process. The BIA publishes guidelines to "assist state courts in applying the ICWA." *In re M.F.*,

7

290 Kan. 142, 151, 225 P.3d 1177 (2010); Department of the Interior—Bureau of Indian Affairs Guidelines for State Courts and Agencies in Indian Child Custody Proceedings, 80 Fed. Reg. 10,146-02 (February 25, 2015). Kansas courts have "previously looked to the Guidelines when interpreting the ICWA." *In re S.M.H.*, 33 Kan. App. 2d 424, 433, 103 P.3d 976 (2005). However, the Guidelines "are 'not intended to have binding legislative effect.'" *In re M.B.*, 39 Kan. App. 2d 31, 37, 176 P.3d 977 (2008) (quoting Department of the Interior—Bureau of Indian Affairs Guidelines for State Courts; Indian Child Custody Proceedings, 44 Fed. Reg. 67,584 [Nov. 26, 1979]). A revised version of the Guidelines was published on February 25, 2015. 80 Fed. Reg. 10,146-02. This was before the temporary custody hearing and the adjudication hearing that occurred in this case.

The Guidelines emphasize that emergency removal should be "as short as possible." 80 Fed. Reg. 10,146-02, 10,155. They suggest that "[t]emporary emergency custody should not be continued for more than 30 days." If temporary emergency custody is continued beyond 30 days, the court should hold a hearing and make a determination, "supported by clear and convincing evidence and the testimony of at least one qualified expert witness, that custody of the child by the parent . . . is likely to result in imminent physical damage or harm to the child" or that "[e]xtraordinary circumstances exist." 80 Fed. Reg. 10,146-02, 10,155.

Father argues there was not an emergency at the time of the children's removal that would justify the State's failure to prove active efforts. However, Father has failed to include the transcript of the temporary custody hearing in the record. This failure makes it impossible to determine whether the court found that the removal was necessary to prevent imminent physical damage or harm to the child. The burden is on the party making a claim to designate facts in the record to support that claim; without such a record, the claim of error fails. *Friedman v. Kansas State Bd. of Healing Arts*, 296 Kan. 636, 644-45, 294 P.3d 287 (2013).

Father also argues the State failed to prove active efforts at the adjudication hearing. The State contends it was not required to prove active efforts at the adjudication because it was conducting an emergency removal. The State also argues the active efforts issue is beyond the scope of the appeal because it is a standard of removal that only applies at the initial temporary custody hearing, which Father did not appeal. This argument is circular. The State is saying that it did not have to prove active efforts at the adjudication hearing because it was effectuating an emergency removal, but then the State says that the emergency removal was completed at the temporary custody hearing so Father cannot challenge it.

The State's argument is not supported by the text of the ICWA. The statute makes it clear that the only way to avoid the requirement of proving active efforts is by proving that the removal is necessary to prevent imminent physical damage or harm to the child. 25 U.S.C. § 1922. The statute does not say that the State is only required to prove imminent physical damage at the temporary custody hearing. In fact, the BIA Guidelines suggest the opposite—they state that any petition for a court order authorizing continued emergency physical custody should be supported by evidence that the threat of imminent physical damage or harm still exists. 80 Fed. Reg. 10,146-02, 10,155.

Even assuming that the court made the necessary findings to support emergency removal at the temporary custody hearing, it is clear that the district court did not make these findings at the adjudication hearing. The magistrate judge acknowledged that the ICWA required either active efforts or an emergency before removing children from a home. Then, the judge stated that "for temporary custody purposes I can make a ruling that an emergency did exist at that time which authorized the removal of the children from the home." While this statement supports the original removal, it does not constitute a finding that 3 months after the removal, Father still presented an imminent danger to the children.

9

Because the magistrate judge never found that continued emergency removal was necessary to prevent imminent harm to the children, the State was required to adhere to 25 U.S.C. § 1912. This means that continued removal was only appropriate if two factors were satisfied: (1) the State proved it engaged in active efforts to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and the efforts were unsuccessful; and (2) the court made a determination, supported by clear and convincing evidence, including the testimony of a qualified expert witness, that the continued custody of the child by the parent or Indian custodian was likely to result in serious emotional or physical damage to the child.

The State did not present evidence that it had made active efforts at rehabilitating the family. The court did not make a finding that the State had satisfied its burden of proving active efforts, likely because the court was proceeding under the emergency removal rules. "As a condition of any foster care placement . . . the district court must find that 'active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful.'" *In re M.B.*, 39 Kan. App. 2d at 37. The State did not attempt to prove active efforts, and the district court made no active efforts finding. Therefore, the judgment of the magistrate judge is reversed on those grounds.

Father also argues the magistrate judge's finding that there was clear and convincing evidence that returning custody to him would likely result in serious harm to the children was not supported by testimony from a qualified expert witness. He argues that 25 U.S.C. § 1912(e) requires an expert to testify that returning custody would likely result in harm to the children. Father argues the State failed to meet its evidentiary burden under 25 U.S.C. § 1912(e) because the expert in this case could not say whether returning the children would be likely to result in harm. The State argues Father misstated the standard under the ICWA. The State contends that because "Father's sole contention with

10

the evidence is that [the expert witness] did not testify to her opinion as to the ultimate issue . . . [a]ny further challenge to the evidence should be waived as being unbriefed or insufficiently briefed."

An appellate court reviews a child in need of care adjudication for substantial competent evidence to support the finding. *In re S.M.H.*, 33 Kan. App. 2d at 432. Substantial evidence refers to legal and relevant evidence that a reasonable person could accept as being adequate to support a conclusion. *State v. Talkington*, 301 Kan. 453, 461, 345 P.3d 258 (2015). To the extent that this issue requires interpretation of the ICWA, that review is unlimited. *Neighbor*, 301 Kan. at 918.

The State is correct that Father misstated the law under the ICWA. 25 U.S.C. § 1912(e) requires "a determination . . . that the continued custody of the child by the parent . . . is likely to result in serious emotional or physical damage to the child." This determination must "[include] testimony of qualified expert witnesses," but the statute does not say that the expert witness has to testify that returning the children to the parent would result in harm. 25 U.S.C. § 1912(e). This means the evidence that the court relies upon in making its determination must include evidence derived from the expert witness' testimony, but is not limited to it.

The State points to several ways the magistrate judge included the expert's testimony in its determination. It is true that the judge made reference to the expert's testimony several times. But, those statements did not relate to her holding at the adjudication hearing that the children were in need of care. For example, the State cites the judge's comments noting that the expert witness testified that emergency removal was appropriate and that the expert understood the reasons for emergency removal. Considerations as to whether the initial emergency removal was appropriate do not support the ultimate determination that 3 months later, there was clear and convincing evidence that returning the children home would result in serious harm. Additionally,

11

when the judge made these statements she was considering whether or not to continue the adjudication—she did not consider what the final adjudication should be until she heard the remainder of the evidence. The State also cites to when the judge "observed that the expert testified that she would expect the parents to be involved in drug treatment before the return of the children and the expert also stated that she was concerned about drug use and no drug use was acceptable to the Tribe." This statement from the judge was also made during the court's consideration of whether or not to continue the adjudication.

The State cites two statements made by the magistrate judge on the day of the adjudication: "The court recalled that the expert witness testified that there should be a mental health report with regard to the parents and a home study or walkthrough" and "[t]he court noted concerns the tribal expert had about Father's behavior." While it is true that the judge made these statements, they were made after the adjudication. The judge had already determined that clear and convincing evidence supported removal of the children. When the judge made the statements the State relies upon, she was considering the disposition of the case.

The magistrate judge did not mention the expert's testimony when making the adjudication:

> "Okay. Well, when I look back through my notes, not just from this hearing but as well as the temporary custody hearing, and I look back to what was happening when this petition was filed . . . the hospital was very concerned about dad bringing the children in with these concerns . . . of worms coming out their skin. . . . I think that goes further than just do we have scabies. He was attempting to show the officer worms coming in and out of the skin, so there's definitely a big concern there.
> "Mother acquiesced in this whether she agreed with dad or not. . . . [I]t appeared to the officer that she did. Had concerns about the worm issue. And some other things at the temporary custody hearing that were brought out was that . . . mother indicated that father had anger issues, that he took prescription drugs that weren't his, and she at that

12

time said she couldn't make the older children go to school. So there were several red flags to the Court at the beginning of this case as well. And all of that information really is [born] out by the positive meth tests, the drug tests that showed positive for meth, both mom and dad.

"So were these children children in need of care when this petition is filed? I think the evidence is clear and convincing that they were. They were being . . . taken to a hospital for a very, very strange reason; these worms coming in and out of their skin. All of these things are just indicative of children who are in need of care. In need of permanent removal from their parent's home, no, but children in need of care. Because of the positive drug tests, the Court found that also they should be out of home until the drug issue could be resolved and . . . underway to a healing of both parents.

"So I do find that the State has met its burden in this case. The . . . statute for the child-in-need-of-care, and I think it's filed under several things, but is without adequate parental care, control, or subsistence. It's not due solely to the lack of financial means of the parents. And the other one, without care or control necessary for the child's physical, mental, or emotional health. And then the other one that they had checked was not attending school. . . . [T]hat information . . . was brought out I think at the temporary custody hearing. But so that's very broad without parental care, control or subsistence or necessary for the child's physical, mental or emotional health. And obviously children who are taken to an emergency room with parents indicating that worms are crawling out [their] skin, that's got to affect the children a little bit not just emotionally but physically as well as mentally.

"So I do find the children to be children in need of care."

The evidence relied upon by the magistrate judge in her preadjudication discourse did not include testimony of qualified expert witnesses as required by 25 U.S.C. § 1912(e). Additionally, the judge did not find that the children were in need of care at the time of the adjudication hearing. She found that the children were in need of care at the time the petition was filed. Therefore, the judge never actually made a ruling that the children remained children in need of care in March 2016. If the judge were permitted to use the same evidence that justified the initial removal to justify continued removal, then

13

removal could be continued indefinitely because the facts justifying the original removal would never change.

The ICWA is clear that there are two ways to remove Indian children from their homes. The first method allows removal if two factors are satisfied: (1) the State proves that it engaged in active efforts to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and the efforts were unsuccessful; and (2) the court makes a determination supported by clear and convincing evidence, including the testimony of a qualified expert witness, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child. 25 U.S.C. § 1912. Here, the State did not prove active efforts. And the magistrate judge did not use the expert witness' testimony to support her determination that the children were in need of care. Thus, removal was inappropriate under 25 U.S.C. § 1912.

The second method of removal under the ICWA is emergency removal. Removal is appropriate under this method if the State proves that it is necessary to prevent imminent physical damage or harm to the child. 25 U.S.C. § 1922. While the district court made a finding that the children faced imminent harm at the initial removal, the district court did not find that the children faced imminent harm months later at the adjudication hearing. And the State did not present evidence that the children faced imminent danger at the time of the adjudication hearing. So, removal could not be legally effectuated under 25 U.S.C. § 1922.

The State did not present sufficient evidence to support either method of removal under the ICWA. Therefore, the district court's decision to continue the foster care placement of the children is reversed.

14

The ICWA is *very* clear in requiring a finding of imminent physical harm or danger before allowing emergency removal. The ICWA is also clear that the traditional method of removal requires the State to engage in active efforts. The magistrate judge did not find that the State engaged in active efforts or that the children faced imminent physical harm, so she did not make sufficient findings under the ICWA to support continued removal.

The magistrate judge's ruling removing D.E.J., R.E.J., and P.E.J. from the home is reversed, and the case is remanded. D.E.J., R.E.J., and P.E.J. remain children in need of care. On remand, the district court, therefore, shall enter such orders as may be appropriate based on their status and conduct such further proceedings as may be necessary.

Reversed and remanded with directions.